**UNITED STATES of America, Appellee,**

v.

**Frederick PRAETORIUS et al., Appellants.**

Nos. 1321, 1329, 1330, 1336, 1338, 1339 and 1375, Dockets 79–1134, 79–1153 to 79–1155, 79–1164, 79–1169 and 79–1183.

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1979.

Decided Dec. 10, 1979.

As Modified on Denial of Rehearing May 7, 1980.

Edward R. Korman, U. S. Atty., E. D. N. Y., Harvey M. Stone, Mark A. Summers, Asst. U. S. Attys., Brooklyn, N. Y., of counsel, for the U. S.

Michael F. Grossman, New York City, for appellant Frederick Praetorius.

Jacob R. Evseroff, Brooklyn, N. Y., Jeffrey A. Rabin, Brooklyn, N. Y., of counsel, for appellant Vincent Auletta.

Iannuzzi & Iannuzzi, John Nicholas Iannuzzi, New York City, for appellant Michael Lanza.

Steven Kimelman, New York City, for appellant William Burley.

Paul B. Bergman, New York City, for appellant Kenneth Lebel.

Joel Winograd, New York City, for appellant Gail Harris.

Harold J. Diller, New York City, for appellant Carlotta Ragan.

Before MESKILL, Circuit Judge, and KELLEHER * and HOLDEN,** District Judges.

KELLEHER, District Judge:

The original indictment charged that these appellants, along with eleven other defendants, were members of a large conspiracy to import heroin from Thailand into the United States. The first count of that indictment charged that one Charles Prae-

torius, brother of Frederick Praetorius, one of the instant appellants, had organized and managed a series of violations of the narcotics laws. Charles Praetorius was ultimately acquitted of that charge, but was convicted on charges of conspiracy and importation. Most of the remaining counts of the instant indictment charged various defendants with substantive violations of the narcotics laws; one count charged all eighteen defendants with conspiracy to violate the narcotics laws. After the first trial resulted in a hung jury on most of the counts of the indictment, the seven instant appellants were tried together. Two other of the original defendants were separately tried and convicted at a second trial.

There are numerous grounds of appeal asserted. Some are raised singly by the several defendants. But ultimately each appellant appears to have joined in the ground asserted by the others "insofar as they are applicable." Accordingly, we recite the facts as found by the jury and thereafter discuss the several issues raised, and finally consider the particular issues applicable to individual defendants.

Most of the evidence in the trials was furnished by two witnesses who had participated in the conspiracy, Ralph Abruzzo and Glenston Page Laws. Abruzzo and Laws were the chief lieutenants of Charles Praetorius, the organizer of the conspiracy.

Abruzzo testified that the conspiracy was begun in 1976, when he and Charles Praetorius traveled on airline employee passes to Bangkok, Thailand. In Bangkok, they made a heroin connection through a call girl with the owner of a bordello. Praetorius and Abruzzo smuggled the heroin which they purchased from the bordello owner back to the United States, taping the heroin to Praetorius' body to escape detection in customs.

Glenston Laws joined the conspiracy in 1976, when he and his wife, Carlotta Ragan (one of the appellants here) offered to finance a trip to Thailand by Praetorius and

---

* Of the Central District of California, sitting by designation.

** Of the District of Vermont, sitting by designation.

his wife, Diane, an old friend of Ragan. Laws and his wife separated soon after the trip had been arranged, and Laws did not learn of the outcome of the trip until June of 1977. However, Abruzzo and Jacob Hunt, one of the buyers of Praetorius' heroin, learned that the Praetoriuses had indeed gone to Thailand, and that Diane had carried heroin back to the United States in her brassiere.

In March of 1977, Praetorius and Abruzzo planned an April trip to Thailand for more heroin. They flew to Thailand as they had discussed, accompanied by Carlotta Ragan and Doris Jackson, a friend of Ragan's (who was acquitted by the jury of all charges). They made a purchase of two kilos of heroin while there. Ragan provided the cash to make the purchase; Praetorius told Abruzzo that Ragan's boyfriend, David Bell, was providing the financing. They taped the heroin inside some airline ski bags, or on their bodies. There was testimony that both Ragan and Jackson were taped up with drugs on this occasion. Abruzzo testified that he carried five ounces of heroin himself, and that Charles Praetorius carried about half a kilo.

Praetorius and Laws arranged in June to make another trip to Bangkok in July. Praetorius recruited two of his New York Airways co-workers to go on the trip as couriers, Kenneth Clark and Louis Juan. Laws was financed on this trip by Danny Warren, a dealer who was previously a customer of Praetorius. Laws, Praetorius, Abruzzo, Clark and Juan left July 6, 1977, for Bangkok. The same method of smuggling the contraband into the United States was used. However, Praetorius and Abruzzo did not carry any heroin on their persons on this trip, but paid Clark and Juan to ferry the drug for them. Clark and Juan left Thailand a couple of days before the others, presumably to insure that they would be isolated from the others in the event they were detected. Upon returning to New York, Praetorius retrieved the heroin from Clark and Juan, and paid them $25,000 per half kilo. Abruzzo "sold" his heroin, which had been carried by Juan into the United States, to Praetorius, who distributed it in this country.

In August, Laws borrowed $24,000 from Praetorius to finance a heroin-purchasing trip to Bangkok, to be taken in the latter part of the month. Laws recruited his own couriers for this trip, with the exception of Frederick Praetorius, Charles' brother (one of the appellants herein), who went along in his brother's behalf to purchase one half kilo. The trip was made in late August and early September, Laws making all of the arrangements to purchase the heroin, and supervising the taping procedures.

In late September, Charles Praetorius, his wife, Diane, Abruzzo, Kenny Pollitt (a co-worker of Abruzzo), Vincent Auletta (also a co-worker, and one of the appellants herein), Eric Romandi and Kenneth Clark made still another trip to Thailand. Pollitt acted as Abruzzo's courier, and Auletta and Romandi acted as Praetorius' courier. Praetorius, Clark and Romandi financed this venture, on arrangements that the heroin would be resold to Praetorius in the United States for distribution. Rather than use their airline privileges to travel, the entire group purchased regular tickets, so as not to be "bumped" from a flight. They purchased four kilos of heroin on this occasion, again taping the drug to their bodies, and again flying back on separate planes to disassociate themselves from one another.

Praetorius planned an even more extensive operation for December, 1977, involving seven couriers and $70,000 worth of heroin (seven kilos). Charles and Frederick Praetorius, and Glenston Laws supervised the December operation. Michael Lanza, Kenneth Lebel and William Burley (friends of Praetorius, and three of the instant appellants) were couriers for Praetorius. Laws recruited four women to act as his couriers, Audrey Plunkett, Brenda Hollenback, Kathy Sargent, and Gail Harris (one of the instant appellants). Burley and Lebel left Bangkok on December 17, 1977. Laws testified that each had there been taped with heroin, which each denied. Burley testified that he left early, upon receiving word that a close friend was very ill in

New York. Laws testified that he saw Lanza crushing the heroin for packing upon his body, but did not actually see the heroin taped to his body. He said that Frederick Praetorius made the heroin purchase, and helped to supervise the taping, along with his brother and Laws. Sargent left on December 17, 1977, the same night that Lebel and Burley left, but on a different flight. Harris and Hollenback left the next night, and Plunkett the night after that. The Praetorius brothers and Lanza left on the 20th of December.

In addition to the testimony of Abruzzo and Laws, the government relied upon the testimony of Pollitt, one of the couriers on the September trip, and Hollenback, one of the December couriers. Jacob Hunt testified to making a series of heroin purchases from Charles Praetorius between November 1976 and June 1977. The testimony regarding the travel of the conspirators was corroborated through documentary evidence such as airline tickets, hotel registrations, passports entries, and customs declarations. Two small quantities of 100 percent pure heroin, sold by Pollitt and Hunt to undercover agents, were admitted into evidence. Another small quantity of 100 percent pure heroin was seized from Charles and Diane Praetorius' home and safe deposit boxes, along with $92,000 in cash. Each of these items was admitted into evidence at the second trial, although each had been suppressed as to Charles and Diane Praetorius at the first trial.

All told, eleven distinct issues are raised by the seven appellants for review by this Court. We conclude that none of the asserted errors by the trial court warrants reversal, and accordingly affirm the convictions of each of the appellants. We now proceed to discuss each of the issues raised.

*The Prosecutor's Summation*

█ Burley contends that the prosecutor argued to the jury based upon evidence which was not in the record. Burley testified at trial that he received a telephone call from his wife in December, while in Thailand, informing him that his best friend was dying. He testified that he

rushed home immediately, cutting short what was to be his vacation. He stated that upon arriving, he called his friend's wife, and visited his friend in the hospital that very evening. He visited his friend again the next day before returning to Johnstown, Pennsylvania.

The prosecutor stated in this argument:

I submit to you ladies and gentlemen that Burley returned to the United States. Yes, he went to the hospital, yes, he saw his friend, but he saw somebody else . . . in New York and that person he saw in New York that he knew was Diane Praetorius . . . and he left the heroin with her and got money from her and went to Johnstown Pennsylvania on the 20th of December, the day he put $6000 in cash in the funds of the account. . . .

Burley argues that there was no evidence on the record that he ever met Diane Praetorius on December 18, 19, or 20. However, there *was* evidence on the record to support the argument that Burley met with Diane Praetorius, albeit circumstantial evidence: (1) Abruzzo testified that he spoke with Diane Praetorius in New York after the others had left for Bangkok, thus placing her in the New York area at the time; (2) Burley testified that he received $30,000 in cash from Praetorius as a loan—the jury could have disbelieved the part about the loan; (3) Burley did not deposit any of the money which he received from Praetorius until *after* he returned from Thailand; (4) there was testimony offered by more than one witness that the standard practice in the conspiracy was to meet with one of the Praetoriuses soon after returning to the United States from Thailand, to turn over the heroin and receive payment for delivery. Since both of the Praetorius brothers were in Bangkok at the time in question, an inference could be drawn that Burley met with someone else in the family in New York, specifically Diane. With all of the above evidence in the record, the prosecutor's summation did not refer to facts not in evidence; it merely invited the jury to draw a permissible inference from the evidence which had been admitted.

██ Burley next contends that the rebuttal summation of the prosecutor was improper because it implanted false evidence before the jury.[1] Burley contends that the statement was a "deliberate misrepresentation" to the court and jury by the Assistant United States Attorney of a fact which he knew to be false, namely, the location of the Praetorius residence in 1977. He contends that there was evidence on the record that the Praetoriuses had moved in November out of their Riverdale apartment. The government argues, persuasively, that the prosecutor only reminded the jury that Charles Praetorius "listed" his address as 5800 Arlington Avenue, not that he actually lived there. Moreover, the testimony was inconclusive as to exactly where their residence was; they may not have abandoned their Bronx apartment until some time after the return from Thailand in December. Given the numerous items of evidence on the record to support the prosecution's version of the facts, it does not appear that the summation was improper.

██ Burley, Lebel and Praetorius all complain about another statement of the prosecutor's, this one made in the rebuttal argument to the jury, after all of the defense attorneys had made their closing arguments. Their contention is that the prosecutor improperly placed his own credibility in issue before the jury.[2] The government responds with the contention that they were merely responding in kind to the vehement attacks made by counsel for the various defendants, in which the integrity of the entire prosecutorial team was impugned.

The basic question to be answered is whether the prosecutor's statements deprived the defendants, or any of them, of a right to a fair trial. *United States v. D'Anna*, 450 F.2d 1201, 1206 (2d Cir. 1971). Numerous cases have held that a prosecutor may not make his own credibility an issue. *See, e. g., United States v. Drummond*, 481 F.2d 62, 64 (2d Cir. 1973). However, when the defense counsel have attacked the prosecutor's credibility or the credibility of the

---

1. The alleged objectionable colloquy is reproduced below:

MR. SUMMERS (AUSA): Do you remember I suggest[ed] to you in my opening, ladies and gentlemen, that Mr. Burley upon returning to New York went to see not only his friend in the hospital but also Diane Praetorius—

[Objection at this point, sustained]

MR. SUMMERS: Ladies and gentlemen of the jury, I ask you to remember one little piece of testimony that may have slipped right by you. Do you remember Mrs. Maida, the wife of William Burley's friend testifying here—

MR. KIMELMAN (Counsel for Burley): Your honor, I am going to object and ask for a side bar.

THE COURT: Overruled.

MR. SUMMERS: Mr. Kimelman asked Mrs. Maida what her address was. She said it was 5700 Arlington Avenue in the Bronx, in Riverdale, New York. I refer you ladies and gentlemen to Government's Exhibit 20, which is Charles Praetorius' hotel registration in Bangkok, Thailand for the December 1977 trip. And you will see on Government's Exhibit 20, Charles Praetorius lists his address as 5800 Arlington Avenue, in the Bronx, in Riverdale, New York.

As Mr. Kimelman told you, ladies and gentlemen, Mr. Burley, according to his own

testimony, went to 5700 Arlington Avenue on the day after he returned to New York.

2. The prosecutor's rebuttal began as follows:

MR. SUMMERS: Thank you, your Honor. If it please the Court, Judge Nickerson, ladies and gentlemen on the jury, ladies and gentlemen, I would like to read to you a list of words that I have been keeping over the past day and a half. The list reads as follows: "Incredible", "totally absurd", "lies", "half truths", "let's make a deal", "fraud", "frightened", "conniver", "cheat", "deceiver", "liar", "bury", "opportunist", "used", "perjurer", "twisted", "fudged", "scum of the earth", "cunning", "figment of imagination", "protect", "swindler", "audacity", and "preposterous."

Now ladies and gentlemen, those words have been used by defense counsel to apply to the Government witnesses, the Government's case, and me, Agent Yaniello, Agent Graffam, Mr. Huffman, and I suggest to you, ladies and gentlemen, that if you believe what you have heard from this courtroom and from that witness stand the last three and a half weeks is a figment of someone's imagination, a deliberate attempt by someone to deceive you, to lie to you, to connive you, to swindle you, if you believe that, walk into that jury room, put your coats on and walk back out here and vote these seven defendants not guilty in five minutes.

government agents, the prosecutor is entitled to reply with "rebutting language suitable to the occasion." *United States v. LaSorsa,* 480 F.2d 522, 526 (2d Cir. 1973); *see also, United States v. Wilner,* 523 F.2d 68, 74 (2d Cir. 1975). The prosecutor in the instant case was responding to what he quite reasonably believed to be attacks on the integrity of the government's case, and which impugned the good faith of the entirety of the government's agents, witnesses, and prosecutorial staff. The record indicates that there were numerous instances of the defendants' attorneys suggesting that the prosecution was engaging in some sort of "frame up," or at least were being duped by the informant witnesses. This rendered quite proper the relatively mild response by the Assistant United States Attorney to the defendants' vitriolic charges. *United States v. LaSorsa, supra.*

*Cross-examination of Laws*

Praetorius contends that the trial judge deprived him of his right to confront witnesses against him by limiting the cross-examination of Glenston Page Laws, one of the two principal witnesses for the government. Laws had given testimony at the first trial in this case, which falsely implicated appellants Lanza and Praetorius. Counsel for Lanza cross-examined Laws regarding his prior testimony, and had established that Laws had indeed lied on the witness stand at the first trial. When Praetorius' attorney began his cross-examination of Laws, he started to question about the same false testimony which his co-counsel had asked. The Court stopped that inquiry, stating, "Don't go through it again, please. We have been through that one once."

■ While it is true that the right of confrontation guaranteed by the Sixth Amendment circumscribes the right of the court to restrict cross-examination, *Smith v. Illinois,* 390 U.S. 129, 88 S.Ct. 748, 750–51, 19 L.Ed.2d 956 (1968), it does not appear that the trial court abused its discretion in this instance. Laws' cross-examination took two and one half days to complete. The cross-examination by counsel for appel-

lant Lanza on the issue which Praetorius complains of on this appeal covers twenty pages of trial transcript. The district court was merely attempting to avoid unnecessary duplication in the cross-examination of the witness, a function which is within the court's discretion and expressly authorized under Rule 611(a) of the Federal Rules of Evidence. "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . avoid needless consumption of time." *Id.* Cross-examination by counsel for Lanza not only was adequate, it was effective in establishing the prior inconsistent testimony by witness Laws. The court's limitation on further repetitious cross-examination by counsel for Praetorius therefore was not an abuse of discretion.

*The Court's Instruction on Reasonable Doubt*

■ Praetorius asserts that the trial court erred in instructing the jury regarding the concept of "reasonable doubt." The court charged the jury, in part, as follows: "If you find the evidence as a whole as to any charge to be as consistent with innocence as with guilt, then you must find the defendant not guilty as to that charge." Praetorius argues that this charge confused the jury, in that it might suggest that the burden of proof for the prosecution is proof by a preponderance of the evidence rather than beyond a reasonable doubt. *Cf. United States v. Hughes,* 389 F.2d 535, 537 (2d Cir. 1968) (error to give similar instruction, when taken in combination with improper summation, and fact that instruction was given as last thing before jury retired to deliberate).

The charge in question had been requested by two of the defense attorneys in the case, and was thereafter approved by all of defense counsel, before it was read to the jury. *See United States v. Taylor,* 562 F.2d 1345, 1364 (2d Cir. 1977). Having failed to object to the instruction and having joined in approval thereof, Praetorius is precluded from raising the issue on appeal for the

first time. *United States v. Bermudez*, 526 F.2d 89, 97 (2d Cir. 1975). Even if he were entitled to object to the instruction on appeal, the charge was not prejudicial. Read in toto, the judge's instructions made it very clear to the jury that the prosecution's burden of proof was beyond a reasonable doubt. The language used has been approved by this Court. *United States v. Cacchillo*, 416 F.2d 231 (2d Cir. 1969).

*Sufficiency of the Evidence to Convict Auletta*

Appellant Auletta argues that the evidence was insufficient to support the jury's finding of guilt against him. He contends that the testimony of witnesses Abruzzo and Pollitt was contradictory, which required the jury to disregard both witnesses' testimony.

Obviously, the jury was free to give credence to the witnesses of its choice. There is no basis for us to hold that the testimony which implicated Auletta in the illegal activities should have been rejected by the jury.

*Prejudice in the Opening Statement*

■ Auletta next argues that he was prejudiced when one of the attorneys for the defense stated that "Charles and Diane Praetorius were convicted in a prior trial." The remark occurred in the opening statement for the defendants' case. The prosecutor objected immediately upon hearing the remark by defense counsel, and the court sustained the objection, instructing the jury to disregard the statement. Auletta's counsel moved for a mistrial at the close of the opening statement. The court discussed the remark with all seven defense counsel outside of the jury's presence; none of the other attorneys joined in the motion for a mistrial. At the end of the trial, the court instructed the jury that "The fact that some of the persons named in the indictment pleaded guilty is not evidence of the guilt of any other defendant or that the crimes charged were committed." The prejudicial effect, if any, was thereby cured. *United States v. Briggs*, 457 F.2d 908 (2d Cir. 1972).

*Admissibility of Lanza's Passport*

Defendant Lanza argues on appeal that he should not have been compelled to surrender his passport to the government and that it should not have been admitted into evidence against him. He contends that admission of the passport violates his Fifth Amendment right against self-incrimination.

At Lanza's arraignment, the United States Magistrate ordered him to surrender his passport to his defense counsel, as a condition of bail. The government subsequently attempted to obtain the passport via search warrant or subpoena duces tecum, but Lanza's attorney refused to surrender it. The parties filed briefs, and the trial court ruled that the passport should be surrendered. From the information on the passport, the government was able to obtain corroborative evidence against Lanza, such as airline tickets, hotel bills, and immigration declarations.

■ Lanza's first contention is that only the Secretary of State is empowered to compel a citizen to surrender his passport. *See* 22 U.S.C. § 211a. Appellant's reading of that statute is plainly wrong. It does not vest the Secretary of State with the *exclusive* jurisdiction over surrender of passports. Nothing in that statute prohibits a court from ordering the holder to surrender it for use in connection with a judicial proceeding.

■ Lanza's other argument is that the passport may not be used in evidence against him because such use violates the Fifth Amendment privilege against self-incrimination. That privilege does not, however, prevent the seizure of a person's personal records, although it may protect a defendant from personally complying with a subpoena. *Andresen v. Maryland*, 427 U.S. 463, 474, 96 S.Ct. 2737, 2745, 49 L.Ed.2d 627 (1976); *see also, Couch v. United States*, 409 U.S. 322, 328, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973). The question to be answered is whether the records or the act of production is "testimonial," and thereby protected under the Fifth Amendment.

The lower court reasoned that since the existence and location of the passport were not in question, the act of production did not constitute testimony within the Fifth Amendment's protective ambit. *See Fisher v. United States*, 425 U.S. 391, 411, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39 (1976). Moreover, the court held, the passport itself is not a testimonial document, being indistinguishable from the business records in *Andresen* and *Fisher, supra.* The district court's determination was correct.

## Sufficiency of the Evidence to Convict Ragan

■ Appellant Ragan argues that the government failed to prove that she was a member of the conspiracy. She contends that her purchase of narcotics was motivated by a plan conceived with David Bell, and not Charles Praetorius. Her contention is without merit. The fact was established that in Thailand she purchased large quantities of heroin which was smuggled back to the United States. Her motivations do not absolve her from guilt along with the other conspirators; her participation was established by the evidence, and her motives were irrelevant to her conviction for conspiracy. The evidence supports her conviction, since it was established that she did the illegal acts alleged for financial gain, agreeing with the other defendants as to the illegal scheme.

■ Ragan next argues that the evidence was insufficient to convict her because it did not conclusively establish that she imported heroin into the United States. Again, the contention is without merit. There was ample circumstantial evidence to support the jury's verdict. There was testimony in the record that she was given a package of heroin and some stretch elastic tape, and had the taping procedure explained to her by Praetorius. The evidence also showed that she went to Praetorius' room to be examined for bulges under her clothing, where the contraband was presumably secreted. She took a flight out of Thailand, bound for London, and then the United States. A jury could properly find that she was guilty of importation based upon this evidence and the inferences reasonably to be drawn therefrom.

## Introduction of Evidence

■ Ragan's final argument is that she was prejudiced by the allowing of certain materials into evidence. Specifically, she objects to the admission of (1) heroin sold by Jacob Hunt to undercover officers, (2) heroin seized from the Praetorius home, and (3) money seized from the Praetorius home and safety deposit boxes. Appellant contends that her involvement with the conspiracy was so tenuous that the admission of the evidence was highly prejudicial. She relies upon *United States v. Falley*, 489 F.2d 33 (2d Cir. 1973) for the proposition that the government may not introduce evidence wholly unrelated to the crime charged, and thereby inflame the jury.

In *Falley*, the government introduced a suitcase into evidence which had allegedly contained a large quantity of hashish, in a prosecution for importation of hashish. However, the hashish which was shown to the jury and introduced into evidence was not related in any way to the crime for which the defendant was being prosecuted; the government introduced it for "shock value." The court of appeals reversed the conviction, noting that substantial prejudice and confusion would likely flow from the questionable tactics. *Id.*, 489 F.2d at 38. In the instant case, by contrast, the evidence was probative on the question of conspiracy, and therefore admissible. The heroin from Hunt had been obtained from Charles Praetorius, soon after one of the trips to Thailand, thus showing that the conspiracy may have been successful in importing the drug. The heroin and cash seized from the Praetorius home and safety deposit boxes were probative on the question of whether the conspiracy existed, tending to show the large cash transactions, and purity of the heroin which was involved. It was relevant, and not unfairly prejudicial as to any single appellant. There was failure of timely objection and no request for an instruction to limit consid-

eration of the evidence to the issue of conspiracy. Under the circumstances, it was not error for the court to admit, or for the jury to consider, the evidence.

*Immunity for Witness Sargent*

Appellant Lebel contends that the district court should have ordered statutory immunity for defense witness Kathy Paige Sargent. He maintains that vindication of his constitutional right to due process required that the Court take such action so as to enable her to testify without fear of prosecution. Sargent had been granted "letter immunity" by the United States Attorney for the Eastern District of New York, but she refused to testify at trial on Lebel's behalf unless she received statutory immunity pursuant to 18 U.S.C. § 6001. After Lebel's counsel made an offer of proof, the district court denied the request for statutory immunity, finding that the proposed examination of Sargent related merely to the credibility of another witness, informant Laws.

The situations in which the United States is required to grant statutory immunity to a defense witness are few and exceptional. Other Circuits have recognized narrow exceptions to this general rule that the government ordinarily need not grant use immunity to a defense witness: (1) where the government has used immunity to compel testimony from its own witnesses, or (2) where the government has used the threat of prosecution to wrongfully force defense witnesses to invoke the Fifth Amendment privilege against self-incrimination. *See United States v. Morrison*, 535 F.2d 223, 229 (3d Cir. 1976); *United States v. Alessio*, 528 F.2d 1079 (9th Cir. 1976); *Earl v. United States*, 361 F.2d 531, 534 (D.C.Cir. 1966). This Circuit has followed the general rule that the United States ordinarily need not grant statutory immunity to a defense witness, although in *United States v. Wright*, 588 F.2d 31, 35 (2d Cir. 1978), this Court left open the issue of whether, under "extraordinary circumstances", due process may require that the government confer use immunity on a witness for the defendant.

In the case at hand, appellant Lebel simply has been unable to cite any "extraordinary circumstances" which would require the government to confer use immunity on the prospective defense witness Sargent. In his offer of proof, Lebel's counsel indicated that he wished to interrogate Sargent about the following: (a) the date upon which she left Bangkok; (b) in whose hotel room she had had the heroin placed on her person for shipment; (c) whether she had informed Laws's girlfriend that she was transporting heroin back to the United States; and (d) whether Laws had told her that she was the first heroin courier in the group to leave Bangkok. Counsel had sought, by way of this interrogation, to attack the credibility of a government witness, informer Laws, by pointing up certain inconsistencies between Laws's and Sargent's respective recollections of certain details of the four matters listed above. None of these four matters directly involved appellant Lebel.

An important factor in the determination of the presence of "extraordinary circumstances" compelling the government to provide statutory use immunity for a defense witness is the materiality of the testimony sought from the witness. The issue of witness credibility, particularly in the factual context presented here, is a collateral matter and does not rise to the kind of "extraordinary circumstance" which would compel government immunization of a defense witness.

The district court was within its discretion in ruling that the testimony of Sargent merely related to the credibility of another witness and, as such, was not crucial to the defense of the case. Accordingly, the judgment of the district court—that immunity for Sargent was not required—is upheld. *United States v. Wright, supra.*

*Non-identification Evidence*

Lebel contends that the district court erred in disallowing evidence that witness Laws failed to identify him at the first trial. Laws had testified on direct examination at that trial that he met eight

of the conspirators in Bangkok, and then identified them in the courtroom, with the exception of Lebel. He did, however, identify Lebel the following day. At the second trial, Lebel's counsel attempted to elicit this fact of non-identification of his client by examining Special Agent Yaniello, the D.E.A. case agent (who had been present at the first trial). The trial judge refused to allow the introduction of the non-identification testimony unless and until Laws was given a chance to explain or deny the statement on the witness stand. The judge relied upon F.R.E. Rule 613(b) which provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

F.R.E. Rule 613(b). Lebel's first contention is that the failure to identify was not a "statement" within the meaning of that term in the rule. The advisory committee note to the rule provides that the rule does not apply to evidence of prior inconsistent conduct. *See* Advisory Committee Note to F.R.E. Rule 613(b). The only definition of "statement" to be found in the Federal Rules is the definition in Rule 801(a): "[a statement includes] nonverbal conduct of a person, if it is intended by him as an assertion." Under that definition, the identification or non-identification of persons in a courtroom can be termed a statement. Lebel's contention to the contrary is without merit.

Lebel, however, correctly points out that the trial judge was misinterpreting the rule in requiring that Laws be confronted with the "statement" immediately. The rule does not specify any particular order of calling witnesses, and so the defense should have been able to introduce the evidence during the examination of Agent Yaniello. *See,* 10 Moore's Federal Practice § 613.02, p. VI–214 (2d ed. 1978); 3 Weinstein's Evidence ¶ 613[04]. The government asserts that even if the court did err with respect to Federal Rules of Evidence Rule 613, the court had the discretion to regulate the questioning as it did under Rule 403.

Having determined that it was error to refuse to admit the evidence, the next inquiry must be whether that error was harmless, or if a new trial is mandated. An error is harmless only if it did not influence the jury, or had but very slight effect. *United States v. Quinto,* 582 F.2d 224 (2d Cir. 1978). Here, it does not appear that the error committed requires reversal. First, it was impeachment testimony as to a collateral matter, Laws' credibility. Second, counsel for Lebel always had the opportunity of calling Laws to the witness stand and confronting him with the identification or non-identification; that was never done. Third, Laws was on the witness stand for two and one half days of cross-examination, and counsel did not inquire at that time about the failure to identify Lebel at the first trial. Under all these circumstances, we must conclude that the error was harmless.

CONCLUSION

The judgments of conviction are affirmed in all respects and as to each defendant.