UNITED STATES, Appellee,

v.

Richard B. HUDSON, Sr., Defendant, Appellant.

No. 90–2134.

United States Court of Appeals, First Circuit.

Heard July 30, 1991.

Decided July 22, 1992.

Rehearing and Rehearing En Banc Denied Oct. 5, 1992.

Barbara A.H. Smith with whom Quinlan & Smith, Boston, Mass., was on brief, for appellant.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., and Nicholas M. Gess, Asst. U.S. Atty., Portland, Me., were on brief, for appellee.

Before TORRUELLA and SELYA, Circuit Judges, and YOUNG *, District Judge.

* Of the District of Massachusetts, sitting by desig-

YOUNG, District Judge.

Richard B. Hudson, Sr. ("appellant") here appeals from his conviction on two separate counts, each charging him with conspiracy to possess with intent to distribute in excess of five hundred grams of cocaine. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846 (1988). The first count alleged that during late 1986 and continuing through 1987, appellant engaged in a cocaine conspiracy with Henry Cormier, Robert Johnson, and others. The second count alleged another cocaine conspiracy, this one commencing in late 1988 and continuing through 1989, involving appellant with his brother, James Hudson, and others. Upon conviction, appellant was sentenced to twenty years imprisonment on Count I (a pre-Guidelines charge), and a consecutive 264–month sentence on Count II (a post-Guidelines charge).

In this appeal, appellant claims the district judge committed error in: (1) excluding testimony which would have impeached the credibility and demonstrated the bias of two important government witnesses; (2) admitting certain testimony as a statement by a co-conspirator; and (3) concluding that, as to Count II, appellant was a leader or organizer of five or more participants. Since appellant's contentions can best be understood in the context of his five-day trial in the district court, we limn the course of the trial briefly before addressing his appellate arguments.

The government opened its case with a focus on the second count. James Hudson, appellant's brother, testified pursuant to a plea agreement that, in 1986, he began buying cocaine in small quantities from appellant's son. Thereafter on each of two occasions, one in the fall of 1988 and the other in early 1989, James Hudson testified that he purchased two kilograms of cocaine from appellant, paying him approximately $25,000 per kilogram. He also testified that he picked up the cocaine at appellant's house in Sabattus, Maine. James Hudson was then vigorously cross examined concerning his motives for cooperating with the government as well as his own exten-

nation.

sive involvement in drug dealing. During the course of his cross examination, James Hudson acknowledged meeting Henry Cormier while being held in the South Windham Correctional Center, and meeting Robert Johnson in the Cumberland County Jail. James Hudson testified that he played cards with Cormier and Johnson while in jail. This cross examination set the tone for the entire defense case which evolved into an attempt to impugn the credibility of the government's witnesses and to suggest they wished to gain favor with the government by dragging appellant down.

The government's next witness was Richard L. Hudson, appellant's nephew, who testified pursuant to a plea agreement that, during the period covered by the second conspiracy, he had engaged in cocaine transactions with appellant, albeit on a more modest scale than his father. He also testified that in early April, 1989, at a meeting arranged by his father, James, appellant told him to stop selling cocaine to an individual named "Ray" because Ray was a big cocaine user who owed appellant $3,200 from earlier cocaine transactions. Richard L. Hudson testified that, when he told appellant that Ray had paid for the cocaine, appellant was interested to know the sale price.

Following the testimony of Richard L. Hudson, the government called to the stand his brother, Michael Hudson (another nephew of appellant), and elicited testimony from him pursuant to a plea agreement. Michael Hudson testified that during the summer of 1988 he made between twenty and thirty purchases of from three and one-half to seven grams of cocaine from appellant, on each occasion picking up the cocaine at appellant's house on Oxford Street in Lewiston, Maine.

The government rounded off its case in chief on the second count with the testimony of Perry Godin, the brother of appellant's girlfriend, who testified under a grant of court-ordered immunity. Godin testified that, beginning in September, 1988, he made weekly purchases of cocaine from appellant, usually in the amount of one gram at a time, but once in the amount of nineteen grams. As was the case with James Hudson, Perry Godin testified that he made these purchases at appellant's house in Sabattus, Maine.

The government then turned to the first count, calling Henry Cormier to the stand, who also testified pursuant to a plea agreement. At the time of appellant's trial, Cormier was incarcerated on a federal prison sentence stemming from his conviction for his role in a cocaine-dealing partnership with Robert Johnson between 1980 and 1987. Cormier said he first met appellant at a poker game in Freeport, Maine, in 1985, and initially sold cocaine to appellant in amounts that did not exceed six ounces in any one purchase. Cormier also testified that appellant complained that the price he was charged for cocaine by Cormier and Johnson was too high. Appellant said that he could buy cocaine at a lower price elsewhere. As a result, in 1986 Cormier and Johnson began to purchase cocaine from appellant for resale. Cormier testified that appellant brought one kilogram of cocaine to Johnson's condominium in Westbrook, Maine, charging $35,000 to $38,000 per kilogram, a price considerably less than the $50,000 per kilogram price being charged by Cormier and Johnson's other suppliers. Cormier explained that he and Johnson repackaged the cocaine into ounce and quarter-ounce portions and distributed it to Dale Hunnewell, David Mann, and others.

Cormier also testified that during the winter and spring of 1986–1987, he and Johnson met appellant at the Howard Johnson's motel in Westbrook in an effort to buy another kilogram of cocaine. At least one such meeting was corroborated by motel registration records signed by appellant on May 23, 1987. Finally, Cormier testified that in September, 1987, he and Johnson purchased a kilogram of cocaine from appellant in Lewiston, Maine, for $35,000. Cormier said that the two drug dealers "gave" this cocaine to one Virgil Buzzell who, in turn, "gave" it to a David Smith. As with all the other government witnesses, defense counsel vigorously cross examined Cormier concerning his drug dealing, his motives in cooperating with the govern-

ment, and his apparent affinity for the lesser sins of gambling and card playing.

Like Cormier, Robert Johnson testified pursuant to a plea agreement while incarcerated on a federal sentence. Johnson corroborated Cormier's testimony in its essential particulars, pointing out that the arrangements for the first purchase of cocaine in kilogram amounts from appellant had taken place at a meeting among appellant, Cormier, and himself at the Howard Johnson's motel at Exit 8 in Portland. A motel record confirmed that, on September 26, 1986, appellant had registered for a room at that motel. Over objection, Johnson testified that Cormier had informed him of the arrest of David Smith in September, 1987, while Smith still possessed some of the cocaine transferred to him through Buzzell.

The government's final witness was Virgil Buzzell, who also testified under a plea agreement. Buzzell testified that he had begun to serve as a middleman for Cormier and Johnson in mid–1987 and that he had been approached by David Smith, who was seeking an introduction to Cormier. Since Cormier distrusted Smith and at first refused to meet with him, Buzzell served as a courier of cocaine and money between Cormier and Smith. As trust grew between Cormier, Buzzell, and Smith, Buzzell introduced Smith to Cormier. While Buzzell knew neither Cormier's cocaine source nor appellant, he confirmed that he delivered a kilogram of cocaine to Smith at a time consistent with the testimony of Cormier and Johnson, and that he watched Smith divide and bag it.

The government concluded its case by reading in evidence a stipulation that on September 25, 1987, government agents seized approximately three-quarters of a kilogram (742.8 grams) of a substance containing cocaine from the residence of David Smith in Portland, Maine, pursuant to the execution of a search warrant.

Throughout, defense counsel had ably sought to impugn the motives of the government witnesses for testifying in a manner which inculpated appellant and had painted each of the government witnesses in the darkest possible hue. Defense counsel now prepared to present appellant's affirmative case.

At this point, the Assistant United States Attorney asked to approach the side bar and asked the Court to require defense counsel to make a proffer and to hear the testimony of the two defense witnesses outside the presence of the jury as it was "from the government's view, rank hearsay." Defense counsel represented that the two witnesses, Paul Whitten and Gregory Benson, were inmates in the South Windham Correctional Center where Henry Cormier and James Hudson had been held. Defense counsel said that one of the two witnesses would testify that he heard Cormier tell James Hudson that appellant "had nothing to do with drugs" but that he was angry with appellant over a gambling debt. What follows next in this side bar conference is vital to an understanding of appellant's claim here. We set forth the relevant colloquy *verbatim:*

THE COURT: What do you say, that is hearsay?

AUSA: Yes.

THE COURT: How do you overcome the hearsay?

DEFENSE COUNSEL: I think it's a situation—

CO–DEFENSE COUNSEL: I think it's evidence of impeachment of bias and motive for a witness who has previously testified that he doesn't have any bias, that he is telling the truth.

THE COURT: How do you get over the hearsay?

CO–DEFENSE COUNSEL: Prior inconsistent statement.

THE COURT: How does it come in over the hearsay?

Counsel then fell to discussing whether proof of a prior inconsistent statement could be made by means of this extrinsic evidence but were brought up short by the court, which said, "Show me a rule that says that that kind of testimony is admissible, it's not as hearsay or as an exception to the hearsay rule?" At this juncture, the Assistant United States Attorney sought to reorient the discussion in such a way as to

confront the issue of the inconsistency of the prior statement with the trial testimony, but the court would have none of it:

> AUSA: Your Honor, the government's position is not so much that it is hearsay but prior inconsistent statement could come in if the defendant—
>
> THE COURT: I'm taking a step at a time. If I get over that hurdle I have to decide that issue.

At this point in the side bar conference, defense counsel, apparently seeking to deal with the judge's concerns, steered the conversation off to two exceptions to the rule against hearsay which might plausibly warrant the admission of the conversation. Federal Rules of Evidence 803(3) and 803(24) were thoroughly discussed and the court went on to hold a *voir dire* examination of both Whitten and Benson.

Whitten testified that Cormier had told James Hudson that he "didn't believe that Dick Hudson had anything to do with drugs" but that Cormier was upset with appellant because "Dick had beat him in a game of gin and it cost him $5,000." Gregory Benson then testified that he had overheard the same conversation and that Cormier had said to James Hudson, "I never really thought your brother sold drugs but me and Robbie ... said he did because he beat us out of a lot of money playing cards, gambling." Benson further testified that James Hudson "said he wanted to make sure the bastard got what he deserved" because "Dick was supposed to take care of [my] family and he never did."

After the *voir dire* testimony of each witness was concluded, the court entertained further argument from counsel. At the close of Whitten's testimony, defense counsel argued that his testimony was admissible pursuant to Fed.R.Evid. 803(3) or 803(24) and pointed out "it goes to bias and motive of the government's witness and in one of the counts and the jury should hear it." The court sustained the government's objection.

After Benson's testimony, the court engaged in a colloquy concerning the provisions of Federal Rule of Evidence 801(d)(1)(B), and defense counsel proffered the testimony generally. The court sustained the government's hearsay objection. The defense then rested without presenting any affirmative evidence. Appellant's conviction followed in due course.

### I.

Appellant first contends that the district court erred in excluding the testimony of the defense witnesses, Paul Whitten and Gregory Benson, contending that this aspect of the appeal is controlled by our decision in *United States v. Barrett*, 539 F.2d 244, 253–56 (1st Cir.1976).

Before addressing this issue, we pause to consider the government's argument which sidesteps with the assertion that even if the district court failed to follow the teaching of *Barrett*, any such error is harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 22–23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *see also United States v. Southard*, 700 F.2d 1, 21 (1st Cir.), *cert. denied sub nom. Ferris v. United States*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *United States v. Praetorius*, 622 F.2d 1054, 1065 (2d Cir.1979), *cert. denied sub nom. Lebel v. United States*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).

As to Count I, we agree. Appellant is entitled to the inference that Cormier, in his jailhouse statement, was referring to appellant and not to appellant's son. This statement is admittedly inconsistent with Cormier's trial testimony and, while it certainly could have been used with some effect to impeach him, we note that he was exhaustively cross examined with a variety of impeachment devices available to the defense. Still, an inconsistent statement concerning the very core facts of the testimony of a key witness is hardly cumulative and we do not, despite the government's urging, base our conclusion upon any such analysis. *Compare United States v. Pitocchelli*, 830 F.2d 401, 403–04 (1st Cir. 1987). Rather, we take into account the significant direct evidence against appellant on Count I from sources that are in no way impugned by Cormier's supposed jail-

house statement since, at most, Cormier's statement might have been used to impeach him alone. Fed.R.Evid. 613(a). The proffered Cormier statement has no bearing on Johnson's credibility or that of any other witness who testified concerning the first conspiracy. Johnson provides independent direct testimony of all the essential details necessary to support a conviction on Count I. Moreover, Johnson's testimony is also corroborated in essential particulars by the testimony of Virgil Buzzell, the motel registrations signed by appellant, and the undisputed evidence of the large amount of cocaine found in Smith's apartment. Taken as a whole, this evidence was well nigh overwhelming. We rule that the error, if any, in excluding the testimony of Whitten and Benson was harmless beyond a reasonable doubt as to Count I.

We cannot reach the same conclusion as to Count II, however. Benson's testimony concerning both the bias of James Hudson and his motivation in testifying against his brother bear significantly upon any assessment of James Hudson's credibility. True, he too was exhaustively cross examined, but we cannot say in these circumstances that exclusion of this added data concerning his credibility would be harmless. James Hudson is the sole witness who establishes the essential elements of the government's case as to Count II. James Hudson's sons, Richard and Michael, and Perry Godin, provided corroborating testimony about cocaine dealings in amounts far less than the requisite five hundred grams. If it was error to exclude Benson's testimony concerning the statement of James Hudson, that error cannot be said to have been harmless beyond a reasonable doubt.

As to Count II, therefore, we turn to the substance of appellant's claim. Because our analysis turns, in significant measure, upon the manner in which counsel raised, and the district court dealt with, the evidentiary issue before it, we have taken the precaution of reviewing the record in *Barrett* in detail. In *Barrett*, the defendant was convicted of the interstate transportation of stolen postage stamps; the concealment, sale, barter, and disposal of stolen

postage stamps; and conspiracy. A principal witness against the defendant, "Bucky" Barrett, was an individual with the nickname "Buzzy" Adams. After the government rested, defense counsel offered two witnesses prepared to testify that, on earlier occasions, Adams had said that Barrett was not involved in the crime. The crucial side bar colloquy may be succinctly quoted as follows:

THE COURT: What is the expected testimony of this witness?

DEFENSE COUNSEL: As I understand it, the witness would testify that he had a conversation with Buzzy Adams and that Buzzy Adams said that he had heard that Barrett had been indicted, or had gotten into trouble on this matter, and that it was too bad because, he, Buzzy, knew that Barrett was not involved.

AUSA: How would he know that?

DEFENSE COUNSEL: Asked Buzzy.

THE COURT: Is that the end of the conversation?

DEFENSE COUNSEL: That is the end of the conversation, as far as I know.

THE COURT: That ... would be out the window on [hearsay] grounds.

DEFENSE COUNSEL: How about credibility of Adams, who testified?

After consulting the then relatively new Federal Rules of Evidence, the district court in *Barrett* excluded the testimony of the first witness out of hand and, after hearing a proffer of the expected testimony of the second witness, excluded that testimony as well.

We reversed, holding that the district court, "albeit rather succinctly," had been adequately apprised of the substance of the evidence and the purpose for its admission; that the proffer demonstrated that Adams' prior statements were inconsistent with his trial testimony; that uncertainty as to the details was a matter for the jury; that defense counsel need not in the circumstances necessarily have had to confront Adams with the earlier inconsistent statements prior to their offer as part of the defense case; and that there was no basis

**955**

for assuming that he could not be recalled by the government or that judicial economy and convenience would have justified the trial court's ruling. *Barrett*, 539 F.2d at 254–56.

■ The law of the Circuit being firmly established in *Barrett*, we proceed to analyze what happened here in the court below. Recognizing the force of the *Barrett* rule and the similarities between that case and this, the government advances three arguments in an attempt to avoid reversal as to Count II. First, the government argues that James Hudson's expressed desire to see that appellant "got what he deserved" is fully consistent with his trial testimony and, as such, is inadmissible. We cannot agree. The use of the term of opprobrium and the expressed anger that appellant had not taken care of James Hudson's family stamp the statement as evidence of bias and hostility. Moreover, the tenor of James Hudson's direct examination had been that he was testifying free of any bias against his brother, the appellant, and the statement tends to give the lie to that inference. In any event, as the *Barrett* court observed, "the jury ... is the principal judge of the credibility of the witnesses and the weight to be given to otherwise admissible testimony." *Barrett*, 539 F.2d at 254. Here the motive arguably behind James Hudson's bias against appellant could weigh significantly in that determination. Indeed, the revelation of witness bias through cross examination is of constitutional dimension in a criminal case. *Olden v. Kentucky*, 488 U.S. 227, 232–33, 109 S.Ct. 480, 483, 102 L.Ed.2d 513 (1988); *United States v. Osorio*, 929 F.2d 753, 759–60 (1st Cir.1991).

■ Next, the government contends that the foundation for admitting extrinsic evidence through Benson about James Hudson's prior statement was never properly laid pursuant to Fed.R.Evid. 613(b), since James Hudson was never "afforded an opportunity to explain or deny [his earlier statement]." The government urges us to reconsider our ruling in *Barrett* in which we explained that the foundation requirements of 613(b) do not require that the witness be confronted with the statement while on the witness stand, but rather, only that the witness be available to be recalled in order to explain the statement during the course of the trial. *Barrett*, 539 F.2d at 254–56. The government properly notes that the Fifth, Ninth, and Tenth Circuits have upheld the refusal to admit proof through extrinsic evidence of prior inconsistent statements unless the witness has first been afforded the opportunity to deny or explain those statements. *See e.g., United States v. Greer*, 806 F.2d 556, 559 (5th Cir.1986); *United States v. Cutler*, 676 F.2d 1245, 1249 (9th Cir.1982); *United States v. Bonnett*, 877 F.2d 1450, 1462 (10th Cir.1989). The Eighth Circuit has followed suit, at least in circumstances in which there are considerable logistical difficulties in arranging for the recall of inmate witnesses sought to be impeached through extrinsic evidence of prior inconsistent statements. *United States v. Lynch*, 800 F.2d 765, 770 (8th Cir.1986), *cert. denied*, 481 U.S. 1022, 107 S.Ct. 1907, 95 L.Ed.2d 513 (1987). We decline the invitation. Assuming without deciding that James Hudson's expression of bias against appellant constituted a prior inconsistent statement with respect to his trial testimony, we reaffirm our earlier analysis as set forth in *Barrett*. The approach there taken is wholly consistent with the requirements of Fed.R.Evid. 613(b), as explained by the notes of the Advisory Committee: "the traditional insistence that the attention of the witness be directed to the statement on cross examination is relaxed in favor of simply providing the witness an opportunity to explain and the opposite party an opportunity to examine the statement, with no specification of any particular time or sequence," and is supported by the great weight of authority. *See* McCormick, *Evidence* § 37 at 80 (3d ed. 1984); 3 Weinstein & Berger, *Weinstein's Evidence* at 613–33 (1991).

■ Here, as in *Barrett*, we have no basis for assuming that James Hudson, a federal prisoner, was not available for recall or that the government would have been prejudiced by admission of the state-

ment without the opportunity for adequate rebuttal and examination. Even though the district court possesses a substantial measure of discretion under Fed.R.Evid. 613(b), it would resurrect the now-discredited procedure laid down in *Queen Caroline's Case*, 2 Brod. & Bing. 284, 313, 129 Eng.Rep. 976 (1820),[1] if we excluded James Hudson's statement on the ground of an inadequate evidentiary foundation when the district court acted without any evaluation of the availability of the witness sought to be impeached or, alternatively, without any expressed consideration of whatever delay or inconvenience might have been caused by defense counsel's failure to confront James Hudson, on cross-examination, with his allegedly inconsistent statement.[2]

 Finally, the government argues that defense counsel failed adequately to apprise the district court of the specific grounds on which they sought admission of James Hudson's prior statement. Essential to an understanding of this issue and the trial dynamic is the purpose for which the evidence here in question was offered. If evidence, notwithstanding its hearsay character, is received generally without any limitation, the jury is entitled to draw all reasonable inferences therefrom. *See e.g., United States v. Tabares*, 951 F.2d 405, 409 (1st Cir.1991); *United States v. Newton*, 891 F.2d 944, 947–48 (1st Cir. 1989); *United States v. Wake*, 948 F.2d

1422, 1434 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2944, 119 L.Ed.2d 569 (1992); *United States v. Foster*, 711 F.2d 871, 877 (9th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984). Thus, defense counsel would have every right to argue in closing that a jury may find that a defendant had not committed a crime if a witness' earlier out-of-court statement had so declared and that statement has been admitted generally. Impeachment evidence, in contrast, is admitted not for the truth of the matter asserted but solely for the fact that the witness' trial testimony is less believable if he has made inconsistent statements about the matter on earlier occasions. *See United States v. Martin*, 694 F.2d 885, 888 (1st Cir.1982). Defense counsel, armed with evidence admitted only for the limited purpose of impeachment, may properly argue only that the client ought be acquitted because the shredded credibility of the witness' trial testimony creates a reasonable doubt concerning the commission of the crime. As a practical matter, of course, this is a significant distinction and aggressive trial counsel quite properly seek to have evidence admitted substantively rather than for any more limited purpose.

Here, the two defense counsel originally proffered the evidence of Whitten and Benson for purposes that would necessarily have to be limited to impeachment and the demonstration of bias. In so doing, how-

1. *See generally*, Leonard J. Stern & Daniel F. Grosh, *A Visit With Queen Caroline: Her Trial and Its Rule*, 6 Cap.U.L.Rev. 165 (1976).

2. We think it is important to note that, both in *Barrett* and in the present case, the trial court's fundamental error lay not in a mistaken interpretation of Rule 613(b) but in its failure to exercise its discretion. Even if a proponent is not always required to lay a prior foundation under Rule 613(b), a trial court is free to use its informed discretion to exclude extrinsic evidence of prior inconsistent statements on grounds of unwarranted prejudice, confusion, waste of time, or the like. *See, e.g., Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1276–77 (7th Cir.1988) (suggesting that trial court has discretion under Fed.R.Evid. 403 to exclude evidence not excluded by Fed.R.Evid. 613[b]); *Williams v. Union Carbide Corp.*, 790 F.2d 552, 556 (6th Cir.1986) (same), *cert. denied*, 479 U.S.

992, 107 S.Ct. 591, 93 L.Ed.2d 592 (1986); *United States v. King*, 560 F.2d 122, 128 n. 2 (2d Cir.1977) (same), *cert. denied*, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977); *see also* 3 Weinstein & Berger, *supra*, at 613–14 to –15. Moreover, *Barrett* notwithstanding, Fed.R.Evid. 611(a) allows the trial judge to control the mode and order of interrogation and presentation of evidence, giving him or her the discretion to impose the common-law "prior foundation" requirement when such an approach seems fitting. *See Nachtsheim*, 847 F.2d at 1276–77 (suggesting that trial court has broad discretion under Rules 611 and 403 to exclude evidence not barred by Rule 613[b]); *United States v. Marks*, 816 F.2d 1207, 1210–11 (7th Cir.1987) (stating that Rule 613 was not intended to eliminate trial judge's discretion to manage the trial in a way designed to promote accuracy and fairness). Here, however, there is no sign that the trial judge sought to exercise these powers.

ever, they never once apprised the district judge that the hearsay issue was immaterial because they sought not to admit the evidence for its truth but rather for the simple fact that the statements had been uttered by Cormier and James Hudson. The close question in this case is whether reversal ought follow because the district judge did not himself limit the evidence and admit it for its only admissible purposes—in the case of Cormier, impeachment and bias, and in the case of James Hudson, bias.

■ Consider the sequence of events presented here in light of our decision in *Barrett*. Here, defense counsel made a general proffer of the expected evidence without in any way suggesting it was being offered for a limited purpose. The court properly noted the hearsay nature of the evidence, and defense counsel responded quite properly that the statements were impeaching evidence "of bias and motive for a witness who has previously testified he doesn't have any bias." The court then repeatedly asked, "How do you get over the hearsay?" To this there was a simple answer: the statements were not being offered for the truth of the matter asserted. Rather, they were being offered simply because they were inconsistent with both Cormier's [3] and James Hudson's testimony at trial. As they were not being offered for the truth of the matter asserted, they were not hearsay in any respect. Fed.R.Evid. 801(c). Despite ample opportunity to address the district court's repeated expressions of concern about the matter, defense counsel instead began to advance arguments that, if accepted, would have permitted the receipt of the evidence generally. Cormier's out-of-court statement that he never thought appellant had anything to do with drugs could then have been argued affirmatively to the jury. *See Tabares*, 951 F.2d at 409. Indeed, when the court gave counsel a final chance to argue their evidentiary positions, defense counsel ap-

peared to advance the admissibility of James Hudson's out-of-court statement generally, although co-counsel's argument with respect to Cormier's testimony was based not only on two recognized hearsay exceptions but also on the ground that his statement "goes to bias and motive of the government's witness ... in one of the counts."

The government argues that defense counsel never stated the "specific ground" upon which they sought admission of James Hudson's statement. *See* Fed. R.Evid. 103(a)(1). *See United States v. Gomez–Norena*, 908 F.2d 497, 500 (9th Cir.) (specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable, grounds on appeal), *cert. denied*, —— U.S. ——, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990). The government's argument is misplaced since, in keeping with the general thrust of the Federal Rules of Evidence in favor of admissibility, "the specific ground of objection" requirement in Fed.R.Evid. 103(a)(1) applies to evidence that is admitted over challenge. Here, in contrast, the applicable rule is Fed.R.Evid. 103(a)(2) which requires only that "the substance of the evidence [be] made known to the court by offer or [be] apparent from the context within which questions were asked." Under this rule:

A party may not claim error on appeal in the exclusion of evidence unless the district court was told not only what the party intended to prove but also for what purpose. *See, e.g.,* 1 Weinstein *Evidence*, § 103(03), at 103–33 (1985 ed.) ("In making an offer of proof counsel must be careful to articulate every purpose for which the evidence is admissible; a purpose not identified at the trial level will not provide a basis for reversal on appeal."). Thus, if evidence is excluded because it is inadmissible for its only articulated purpose, the proponent of the evidence cannot challenge the ruling on

---

**3.** We recognize that, having ruled that it was harmless error to exclude Cormier's out-of-court statement, our precise concern is with the out-of-court statement of James Hudson. We analyze the two together, however, since that is the

manner in which the issue was presented to the district court and we think the arguments advanced by defense counsel with respect to either statement pertain to both.

appeal on the ground that the evidence "could have been rightly admitted for another purpose." McCormick, *Evidence* § 51, at 112 (1972). *Tate v. Robbins & Myers, Inc.*, 790 F.2d 10, 12 (1st Cir.1986). Federal Rule of Evidence 103 is, of course, equally applicable to both civil and criminal cases and we consider the *Tate* decision to be of equal pertinence here.

We have little hesitancy in finding that the purpose for which defense counsel intended to introduce the Cormier and James Hudson statements was fully articulated in the district court. It is true that, in response to the concerns of the presiding judge, counsel attempted to formulate a rather hapless argument concerning the applicability of certain exceptions to the rule against hearsay. Nevertheless it is clear to us that defense counsel neither abandoned nor waived their insistence that the proffered evidence was admissible to impeach James Hudson on the ground that it demonstrated his bias against appellant. True, no particular mention of this ground was made when the district court gave counsel their last chance to argue the point, but, just minutes before, co-defense counsel had reiterated the impeachment and bias ground for admissibility while arguing for the admission of Cormier's prior statement. In these circumstances, a fair reading of the trial transcript compels the conclusion that the purpose for the admission of James Hudson's prior statement was adequately articulated.

There remains the question whether defense counsel ought have explained both why the rule against hearsay was inapplicable in such circumstances, and also that they were offering James Hudson's statement solely for the limited purpose of impeachment. Of course, given the tactical advantage that accrues to counsel who are able to succeed in obtaining admission of evidence generally, there is little incentive for defense counsel to stake out limits unless judicially required. Still, recognizing full well the rapid-fire nature in which these complex issues are presented in an active jury trial session and the necessarily different perspective afforded by hindsight, we nevertheless conclude that we are constrained to reverse the trial judge on this point. Federal Rule of Evidence 103(a)(2) imposes upon counsel no such procedural requirements as just described, it being sufficient that "the substance of the evidence was made known to the court by offer or was apparent from the context." Fed.R.Evid. 103(a)(2). Moreover, *United States v. Barrett* necessarily holds that even the most succinct reference to the potential impact of the proffered evidence on the credibility of a witness is sufficient to trigger the duty to inquire into admissibility under Fed.R.Evid. 613(b). We would be overruling *Barrett* if we were to erect in this case a standard of articulation of purpose that goes beyond mere mention of the impeaching nature of the evidence and its proffer in order for the district court to place it in context. This we cannot do. *See e.g., United States v. Anagnos*, 853 F.2d 1, 3 (1st Cir.1988); *United States v. Martorano*, 620 F.2d 912, 920 (1st Cir.), *cert. denied*, 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980).

II.

Appellant mounts a second attack upon his conviction on Count I, arguing that it was error to admit Johnson's testimony that Cormier had told Johnson that David Smith had been arrested while in possession of cocaine that had been distributed down through the chain from appellant to Smith. Appellant argues that this statement from Cormier to Johnson was hearsay and that it provided the necessary precondition for the stipulation that Smith was in fact arrested while in possession of a large quantity of cocaine. The district court found, pursuant to Fed.R.Evid. 104(b), that the statement was made by one of appellant's co-conspirators during the course of, and in furtherance of, the conspiracy. Fed.R.Evid. 801(d)(2)(E). *See United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977); *see also United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.), *cert. denied sub nom. Bancroft v. United States*, 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1980). This finding was emi-

nently correct. Smith's arrest hardly brought an end to appellant's on-going conspiracy. *See United States v. Jones*, 913 F.2d 1552, 1563 (11th Cir.1990); *United States v. Goff*, 847 F.2d 149, 170 (5th Cir.), *cert. denied sub nom. Kuntze v. United States*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988). Likewise, it is the very quintessence of the conspiratorial partnership that one conspirator will inform another of the arrest of a third so that the conspirators may be on guard that the same fate not befall them. *See United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir.1989). The district court was plainly correct in finding that the statement from Cormier to Johnson was "part of the information flow between conspirators intended to help each perform his role." *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir.1988).

### III.

Since we are constrained to reverse appellant's conviction on Count II (the post-Guidelines charge), we have no occasion to consider his appeal from the Guidelines sentence imposed on that charge.

*Appellant's conviction on Count I is affirmed. The conviction on Count II is vacated and remanded for further proceedings in accordance with this opinion.*

SELYA, Circuit Judge (concurring).

I join enthusiastically in much of Judge Young's impeccably reasoned opinion. In respect to the court's discussion of Count II of the indictment, however, my enthusiasm is tempered by my fundamental disagreement with the premise of *United States v. Barrett*, 539 F.2d 244 (1st Cir. 1976). Nevertheless, because this panel is duty bound to follow *Barrett* whether or not we regard it as good law, *see Fournier v. Best Western Treasure Island Resort*, 962 F.2d 126, 127 (1st Cir.1992) (in a multipanel circuit, newly constituted panels are customarily bound by prior panel decisions squarely in point); *United States v. Wogan*, 938 F.2d 1446, 1449 (1st Cir.) (similar), *cert. denied,* — U.S. —, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991), I concur in the judgment. I write separately, however, to express my thoughts as to why *Barrett* bears overruling and as to how Fed.R.Evid. 613(b) was meant to operate.

This court decided *Barrett* soon after the Federal Rules of Evidence took effect. Since that time, most (though not all) of the circuits have rejected *Barrett*'s rationale, deciding instead that the adoption of Rule 613(b) did not abolish the traditional common law requirement of laying a suitable foundation prior to the introduction of impeachment evidence. *See, e.g., United States v. Devine*, 934 F.2d 1325, 1344 (5th Cir.1991), *cert. denied,* — U.S. —, —, —, 112 S.Ct. 349, 911, 952, 116 L.Ed.2d 288, 811, 117 L.Ed.2d 120 (1991); *Gong v. Hirsch*, 913 F.2d 1269, 1274 (7th Cir.1990); *United States v. Bonnett*, 877 F.2d 1450, 1462 (10th Cir.1989); *United States v. Lynch*, 800 F.2d 765, 770 (8th Cir.1986), *cert. denied*, 481 U.S. 1022, 107 S.Ct. 1907, 95 L.Ed.2d 513 (1987); *United States v. Cutler*, 676 F.2d 1245, 1249 (9th Cir.1982); *United States v. DiNapoli*, 557 F.2d 962, 964–65 (2d Cir.1977), *cert. denied*, 434 U.S. 858, 98 S.Ct. 181, 54 L.Ed.2d 130 (1977). *But see Wammock v. Celotex Corp.*, 793 F.2d 1518, 1521–23 (11th Cir.1986); *United States v. McGuire*, 744 F.2d 1197, 1203–04 (6th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 159 (1985). In my estimation, the majority rule is sounder than the view espoused in *Barrett*. It works to avoid unfair surprise, gives the target of the impeaching evidence a timely opportunity to explain or deny the alleged inconsistency, facilitates judges' efforts to conduct trials in an orderly manner, and conserves scarce judicial resources. At the same time, insistence upon a prior foundational requirement, subject, of course, to relaxation in the presider's discretion if "the interests of justice otherwise require," Fed.R.Evid. 613(b), does not impose an undue burden on the proponent of the evidence.

It is my hope that this court, for the time being, will take pains not to expand the *Barrett* principle; and that, moreover, in a proper case, the en banc court will revisit *Barrett* and bring our interpretation of

Fed.R.Evid. 613(b) into line with the majority of our sister circuits.