USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-2146 UNITED STATES OF AMERICA, Appellee, v. DENNIS JOSLEYN, Defendant, Appellant.  ____________________ No. 95-2147 UNITED STATES OF AMERICA, Appellee, v. JOHN W. BILLMYER, Defendant, Appellant.  ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Joseph A. DiClerico, Jr., U.S. District Judge] ___________________  ____________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________  ____________________ David W. Long, with whom Joseph E. Zeszotarski, and Poyner & _____________ _____________________ ________ Spruill, LLP were on brief for appellant Billmyer.  ____________ Paul Twomey, with whom Twomey & Sisti Law Offices was on brief ___________ __________________________ for appellant Josleyn. Michael J. Connolly and Donald A. Feith, Assistant United States ___________________ _______________ Attorneys, with whom Paul M. Gagnon, United States Attorney, was on ______________ brief for appellee.  ____________________ October 15, 1996  ____________________ 2 CYR, Circuit Judge. A federal jury sitting in New CYR, Circuit Judge. ______________ Hampshire returned guilty verdicts against appellants John W. Billmyer and Dennis R. Josleyn for conspiring to defraud their former employer, American Honda Motor Company ("Honda"), by accepting money and other valuable consideration from prospective Honda dealers in exchange for lucrative dealership rights and sundry advantage. See 18 U.S.C. 371 (conspiracy) & 1341 (mail ___ fraud) (1994). Verdicts were returned also against Josleyn for racketeering, conspiracy, and mail fraud, see id. 1962(c), 371 ___ ___ & 1341, relating, inter alia, to kickbacks received in connection _____ ____ with national sales training seminars and dealer advertising programs for Honda dealers. On appeal, Billmyer and Josleyn principally contend that New Hampshire was an improper venue for the franchise conspiracy charge in Count II and that there was insufficient evidence to support the guilty verdicts. We affirm the district court judgments in all respects.  I I BACKGROUND1 BACKGROUND __________ Following the second OPEC oil embargo in 1979, American consumer demand for the energy-efficient automobiles manufactured by Honda skyrocketed, and remained strong for a decade thereaf- ter. Just as demand in the United States surged, the Japanese government imposed export restraints on its carmakers, and Honda  ____________________ 1We recite the background facts the jury reasonably could have found, viewing the evidence in the light most favorable to the verdicts. See United States v. Bello-Perez, 977 F.2d 664, ___ ______________ ___________ 666 (1st Cir. 1992).  3 was unable to meet the demand for its automobiles in the United States. These uncommonly favorable market conditions endured throughout much of the 1980s, causing enterprising car dealers in the United States to compete fiercely (and sometimes unfairly) for exclusive Honda franchises in anticipation of the extraordi- narily large profit margins available on such popular Honda models as the Civic, Prelude, and Accord. Appellant John Billmyer joined Honda as a district sales representative in 1970, and rose rapidly through all four management levels in its field sales division.2 By 1977, Billmyer had been appointed regional sales manager for the eastern United States. By 1980, he held the top field sales position at Honda national sales manager and soon moved from its New Jersey office to headquarters in California. When Honda launched a line of luxury automobiles in 1985, Billmyer became national sales manager for the new Acura Division as well. He remained the top Honda field sales manager in the United States until he retired on March 31, 1988. After Billmyer retired, he was succeeded as national sales manager by S. James Cardiges, his closest associate at Hon- da. Billmyer had hired Cardiges as the Honda sales manager for the Baltimore/Washington D.C. district in 1977, and rapidly  ____________________ 2At Honda, district sales managers in the field maintained day-to-day contact with their dealers and reported to their respective zone sales managers. Each zone manager was responsi- ble for Honda sales in several states. Zone managers in turn reported to their respective regional sales managers. The two regional managers each supervised Honda sales in the field for roughly one-half the country.  4 promoted him through the ranks: from zone manager for the mid- Atlantic states in 1979, to zone manager for the west coast (the largest and most prestigious zone) in 1981, to regional sales manager for the western United States in late 1982. While western regional sales manager, Cardiges worked closely with Billmyer. The two often traveled to work together and took business trips within the United States and overseas. Finally, Cardiges succeeded Billmyer as national sales manager in 1988. He resigned in April 1992 by "mutual agreement" with Honda, to forfend termination. Appellant Dennis R. Josleyn joined Honda in January 1983, and followed a similar path: assistant sales manager for the mid-Atlantic zone in 1985; mid-Atlantic zone manager in March 1987; and zone manager for the west coast, resident in Califor- nia, in early 1991, a position he held until he resigned from Honda in April 1992. Throughout appellants' tenure with Honda, corporate policy and procedures for awarding new Honda dealerships were set forth in the "Honda Automobile Dealer Appointment Procedures Manual." The first step was to identify a geographic area ripe for a new dealership in Honda terminology an "open point"  through reference to marketing and demographic studies, data relating to competition, and an assortment of other information. Next, the district and zone sales managers for the area under consideration were to "prospect" for a qualified dealer to fill the "open point," then compose a slate of three or more suitable 5 candidates. Honda policy directed that sales managers evaluate candidates according to their experience in automobile retailing, available capital, personal reputation, and the quality of their location and facilities, all with the ultimate aim that Honda dealerships be awarded to the best candidates.  Honda sales managers at each level, see supra note 2, _____ _____ ________ __ ____ _____ ___ _____ were required to participate in recommending and approving candi- ____ ________ __ ___________ __ ____________ ___ _________ ______ dates for any "open point." With the possible exception of _____ ___ ___ ____ _____ Billmyer and Cardiges, in their respective capacities as national sales manager, no sales manager at any level possessed unilateral __ _____ _______ __ ___ _____ _________ __________ authority to award a new dealership. Furthermore, approval was _________ __ _____ _ ___ __________ required from managers representing the parts, service, and market-representation departments as well.  Once selected for an "open point" dealership, with the approval of sales managers at the district, zone, regional, and national levels, a successful candidate received a "Letter of In- tent" ("LOI") from Honda via United States mail, authorizing the prospective dealer to open the new, exclusive dealership upon certain conditions, such as constructing a facility within a specified time. Until the franchise itself was issued to the prospective dealer, however, these LOI rights remained the property of Honda. Like its competitors, Honda exacted no fee for its dealership franchises. Nor were Honda personnel allowed to accept money or other consideration of significant value for assistance in obtaining a Honda franchise.  In addition to Honda policy and procedures governing 6 new dealerships, its "conflict of interest" policy prohibited employees from accepting anything of significant value from a Honda dealer and from acquiring or holding any interest in a Honda or Acura dealership. The "conflict of interest" policy was disseminated among all Honda sales managers, who were required to sign disclosure forms indicating ongoing compliance. Sales managers at every level were duty-bound to ensure that their respective subordinates honored the policy prohibiting conflicts of interest, and report all violations to their senior manager or the Human Resources Department. Notwithstanding these rigorous internal procedures, however, there were numerous violations of the "conflict of interest" policy. From the late 1970s through the early 1990s, sales managers at every level commonly accepted money and valu- able gifts, including Rolex watches, furniture, and business suits, from prospective dealers vying for "open points" or from dealers seeking increased Honda automobile allocations. Yet their illicit activities apparently escaped notice by nonpartici- pating sales managers and dealers for years.  Finally, in 1991 an internal investigation was trig- gered by an uninvolved district sales representative in Arkansas who provided a Honda executive vice-president with evidence of payoffs involving Cardiges, then the national sales manager, and a zone manager. By early 1992, Honda had begun "cleaning house" and Cardiges had resigned. An extensive federal criminal inves- tigation ensued.  7 On March 11, 1994, a federal grand jury in New Hamp- shire returned an indictment against Billmyer, Josleyn, Cardiges and two lower-level Honda sales managers responsible for the New England region, David L. Pedersen and Damien C. Budnick.3 Superseding indictments were returned against Billmyer, Josleyn, and Cardiges in October 1994 and January 1995. Ultimately, Budnick, Cardiges, and Pedersen entered into plea agreements and cooperated with the government. Cardiges and Pedersen were key government witnesses at trial.  The second superseding indictment charged Josleyn and Cardiges, in Count I, with a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act ("RI- CO"), 18 U.S.C. 1962(c) (1994). As Racketeering Act 1, it alleged that Josleyn and Cardiges had persuaded Honda to select a particular outside vendor (from which the defendants had received kickbacks) to conduct sales training seminars for Honda salespeo- ple employed in New Hampshire and elsewhere in the United States. Racketeering Acts 2 through 8 related to regional advertising associations which pooled monies advanced by individual Honda dealers to defray their local Honda advertising costs. Josleyn and Cardiges were charged with causing Honda to match the contri-  ____________________ 3Pedersen had joined Honda in July 1979 as a district sales manager for Maine, New Hampshire, Vermont, and upstate New York. Within a year he was transferred to Minnesota. Around June 1982, he became a district sales manager in northern Ohio; in 1985, a district sales manager in the new Acura Division, responsible for a territory extending from Maine to Minnesota; and, in March 1987, an assistant zone manager, responsible for the area which included New Hampshire. Budnick, a district sales manager also responsible for New Hampshire, reported directly to Pedersen.  8 butions made by the Honda dealers to these regional advertising associations, on the condition that the advertising associations hire a particular vendor (controlled by Josleyn's brother) to provide the advertising services. After receiving payments from the regional advertising associations, the vendor allegedly made kickbacks to Josleyn and Cardiges. Other Racketeering Acts described in Count I alleged, inter alia, that Josleyn and _____ ____ Cardiges received kickbacks for awarding numerous LOIs to various dealership candidates in California, Maryland, New York, and other states. Count II charged Billmyer, Cardiges, and Josleyn with conspiring to defraud Honda by accepting payments and other valuable consideration from dealers and prospective dealers in exchange for LOIs or other preferred treatment. Count III (conspiracy) and Count IV (mail fraud) charged Josleyn and Cardiges with accepting kickbacks from 1989 through 1992, in relation to the sales training seminars. Overall, Josleyn was charged in all four counts, whereas Billmyer was charged with the Count II "dealer franchise" conspiracy only. Trial began on February 7, 1995, before Chief Judge Joseph A. DiClerico, Jr.4 After presenting thirty-five witness- es, including Cardiges and Pedersen and many Honda dealers from around the country, the government rested its case on May 10, 1995. Billmyer opted to present no witnesses, while Josleyn  ____________________ 4Three weeks into the trial, we were called upon to resolve a discovery dispute. See United States v. Billmyer, 57 F.3d 31 ___ ______________ ________ (1st Cir. 1995). 9 mounted a defense based on the theory that top Japanese execu- tives in Honda had condoned the activities alleged in the indict- ment. At the close of the evidence, the district court denied appellants' renewed Rule 29 motions for judgments of acquittal. See Fed. R. Crim. P. 29(a). ___ The case went to the jury on May 19. Seven days into the deliberations, guilty verdicts were returned against both Billmyer and Josleyn. After denying their motions for judgments of acquittal, the district court sentenced Billmyer to a five- year prison term and a $125,000 fine; and Josleyn to six and one- half years in prison on Count I and a five-year prison term on each of the three remaining counts, all to be served concurrent- ly. II II DISCUSSION DISCUSSION __________ A. Joinder of Defendants  A. Joinder of Defendants _____________________ As in the district court, Josleyn and Billmyer contend on appeal that their joint indictment and trial violated Fed. R. Crim. P. 8.5   ____________________ 5Rule 8 provides: (a) Joinder of Offenses. Two or more offenses may (a) Joinder of Offenses. be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the ____ __ _______ _________ same act or transaction or on two or more acts or ____ ___ __ ___________ __ ____ __ transactions connected together or constituting parts ____________ of a common scheme or plan. ______ ______ __ ____ (b) Joinder of Defendants. Two or more defendants (b) Joinder of Defendants. may be charged in the same indictment or information if they are alleged to have participated in the same act _______ ____________ ____ ___ 10 The federal courts have long recognized that consoli- dated trials tend to promote judicial economy, conserve prosecu- torial resources, and foster the consistent resolution of factual disputes common to properly joined defendants. See, e.g., United ___ ____ ______ States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 60 (1st ______ ________________________________ Cir. 1991). In resolving a Rule 8(b) misjoinder claim, the trial court must examine the indictment to determine whether there is a factual basis for joining the defendants. United States v. ______________ Boylan, 898 F.2d 230, 245 (1st Cir.), cert. denied, 498 U.S. 849 ______ _____ ______ (1990). While Rule 8 harbors the potential for unfair prejudice in consolidated trials, see King v. United States, 355 F.2d 700, ___ ____ _____________ 703-04 (1st Cir. 1966) (Aldrich, C.J.) (noting risk that jury may infer guilt by association), the rule nonetheless may be gener- ously construed in favor of joinder, given the protective discre- tion vested in the trial court under Fed. R. Crim. P. 14. The district court apparently concluded that the Count II dealer franchise conspiracy charge against Billmyer and Josleyn warranted their joinder under Rule 8(b). Its conclusion plainly would have been unexceptionable had the indictment contained only Count II, see United States v. Morrow, 39 F.3d ___ _____________ ______ 1228, 1237-38 (1st Cir. 1994), cert. denied, 115 S. Ct. 1421 _____ ______ (1995), or had the conspiracy alleged in Count II clearly encom-  ____________________ or transaction or in the same series of acts or trans- ____ ______ __ ____ actions constituting an offense or offenses. Such ____________ __ _______ defendants may be charged in one or more counts togeth- er or separately and all of the defendants need not be charged in each count.  Fed. R. Crim. P. 8 (emphasis added). 11 passed all substantive offenses alleged in the indictment. See ___ United States v. Arruda, 715 F.2d 671, 678 (1st Cir. 1983). ______________ ______ Otherwise, joinder under Rule 8(b) was problematic unless the criminal acts alleged in all counts were part of the same series __ ___ ______ ____ ______ of acts or transactions. See United States v. Yefsky, 994 F.2d ___ _____________ ______ 885, 895 (1st Cir. 1993).  A misjoinder of defendants requires a reversal only if the resulting prejudice "`had substantial and injurious effect or influence in determining the jury's verdict.'" United States v. _____________ Lane, 474 U.S. 438, 449 (1986) (mandating "harmless error" review ____ of Rule 8(b) misjoinder) (quoting Kotteakos v. United States, 328 _________ _____________ U.S. 750, 776 (1946)). As it would be incumbent upon this court in all events to conduct the "harmless error" analysis mandated in Lane were we to conclude that a misjoinder occurred, see id., ____ ___ __ and since the misjoinder question itself is far from clear, we will assume, without deciding, that the misjoinder occurred as claimed by Billmyer, and proceed directly to the "harmless error" inquiry. See United States v. Edgar, 82 F.3d 499, 504 (1st Cir.) ___ _____________ _____ (bypassing misjoinder question where any error ultimately would prove harmless), petition for cert. filed, 65 U.S.L.W. 3110 (U.S. ________ ___ _____ _____ July 16, 1996) (No. 96-178). We conclude that any misjoinder was harmless.  Not only did the parties marshal their evidentiary presentations to minimize prejudicial spillover, but throughout the trial the district court prudently and carefully cautioned the jury to consider the evidence against each individual defen- 12 dant. No less importantly, Billmyer's retirement from Honda, prior to the time Josleyn launched the dealer advertising associ- ation and sales training schemes, unquestionably facilitated the individualized factfinding focus to which each defendant was entitled from the jury. Cf. Morrow, 39 F.3d at 1235-36 (errone- ___ ______ ous admission of hearsay under coconspirator exception held to be "harmless" given distinctiveness of two fraudulent schemes).  Finally, at the close of all the evidence, the trial judge gave a careful cautionary instruction, once again reminding the jury to consider the evidence against each defendant individually. See ___ Lane, 474 U.S. at 450 (limiting instructions mitigate prejudice ____ from misjoinder).  Although these safeguards may not have sufficed in another case, the evidence against both Billmyer and Josleyn can only be described as overwhelming. See Randazzo, 80 F.3d at 628. ___ ________ An army of former Honda executives, including Cardiges, Billmyer's proteg and eventual successor, as well as numerous Honda dealers, presented a wealth of telling evidence against appellants. See Lane, 474 U.S. at 450 (noting overwhelming ___ ____ evidence of guilt); see infra Section II.B.3. Consequently, we ___ _____ are persuaded that no aspect of the jury's decision was substan- tially influenced by any misjoinder. See O'Neal v. McAninch, 115 ___ ______ ________ S. Ct. 992, 995 (1995). B. Sufficiency of the Evidence and B. Sufficiency of the Evidence and _______________________________ Venue (Franchise Conspiracy Count) Venue (Franchise Conspiracy Count) _________________________________ The jury found that both appellants participated in the 13 dealership franchise conspiracy alleged in Count II.6 Neither appellant seriously disputes that he conspired with Cardiges. Rather, their principal contention is that there was insufficient evidence to prove, beyond a reasonable doubt, that they both ______ _ __________ _____ participated in the same conspiracy with Pedersen, which, they maintain, was essential to establish both the substantive con- spiracy charge in Count II and proper venue in New Hampshire. As ___ their contention confuses the standards of proof applicable to these two distinct issues, and the record demonstrates that the government readily met both, appellants' convictions under Count II must be affirmed. 1. Standard of Proof 1. Standard of Proof _________________ The unchallenged instructions apprised the jury that the government was required to prove four elements, beyond a reasonable doubt, in order to prevail on Count II: (i) two or more persons entered into the unlawful agreement charged in the indictment; (ii) the particular defendant, knowing the purpose of the agreement, knowingly and willfully became a member of the conspiracy; (iii) some member of the conspiracy knowingly commit- ted at least one alleged overt act; and (iv) at least one overt  ____________________ 6Count II alleged that Billmyer, Josleyn, Cardiges, and others known and unknown, conspired to defraud Honda by accepting money and other valuable consideration in exchange for LOI rights and other preferential treatment to various Honda dealers and prospective dealers. Only one overt act in furtherance of the franchise conspiracy alleged in Count II took place in the District of New Hampshire. It alleged that David Pedersen, then an assistant zone sales manager responsible for New Hampshire, had recommended one Thomas Bohlander for an Acura dealership in Nashua, New Hampshire, in return for approximately $18,000 in college tuition payments for Pedersen's son. 14 act was committed in furtherance of the conspiracy. See, e.g., ___ ____ United States v. Sawyer, 85 F.3d 713, 714 (1st Cir. 1996) (citing _____________ ______ United States v. Frankhauser, 80 F.3d 641, 653 (1st Cir. 1996)); ______________ ___________ United States v. Brandon, 17 F.3d 409, 428 (1st Cir.), cert. ______________ _______ _____ denied, 115 S. Ct. 80 (1994). Thus, the jury need only have ______ found beyond a reasonable doubt that each appellant conspired with at least one other person (e.g., Cardiges), and not neces- sarily with Pedersen as well. Putting aside for the moment the question of guilt, see ___ infra Section II.B.3, it is clear that adequate evidence of _____ Pedersen's role in the dealer franchise conspiracy was essential to establish New Hampshire as a proper venue for Count II.7 Without objection, the district court instructed the jury that the government must establish, by a preponderance of the evidence _____________ (rather than beyond a reasonable doubt), that Pedersen, Billmyer and Josleyn joined the Count II conspiracy and that Pedersen committed the alleged overt act involving the Acura dealership in Nashua, New Hampshire. See United States v. Cordero, 668 F.2d ___ _____________ _______ 32, 45 n.18 (1st Cir. 1981) (applying preponderance standard, as venue is not an element of conspiracy offense); supra note 6. _____  ____________________ 7Venue rights are guaranteed by the Constitution, see U.S. ___ Const. art. III, 2, cl. 3; United States v. Georgacarakos, 988 _____________ _____________ F.2d 1289, 1293 (1st Cir. 1993), and prescribed by the Federal Rules of Criminal Procedure, see Fed. R. Crim. P. 18 ("Except as ___ otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed."). Venue "concerns only the place where the case may be tried[,]" whereas jurisdiction "has to do with the authority or power of a court to try a case." Wayne R. LaFave & Jerold H. Israel, Criminal Procedure 16.1, at 334 (1984 & Supp. 1991) (footnotes ___________________ omitted).  15 Thus, consistent with the unchallenged jury instructions on conspiracy and venue, as well as applicable law, the government could establish venue in New Hampshire by only a preponderance of the evidence, but it was required to prove each appellant's participation in the conspiracy beyond a reasonable doubt.8  2. Standard of Review 2. Standard of Review __________________ We will uphold the verdicts under Count II if a ratio- nal juror could have found each substantive element of the alleged conspiracy beyond a reasonable doubt, United States v. ______________ DiMarzo, 80 F.3d 656, 660 (1st Cir.), petition for cert. filed, _______ ________ ___ _____ _____ No. 96-5578 (U.S. Aug. 13, 1996), and proper venue by a prepon- derance of the evidence, Cordero, 668 F.2d at 45 n.18. All _______ credibility issues are to be resolved, and every reasonable inference drawn, in the light most favorable to the verdict. DiMarzo, 80 F.3d at 660; United States v. Lam Kwong-Wah, 924 F.2d _______ _____________ _____________ 298, 301 (D.C. Cir. 1991) (venue). A thorough review of the entire record discloses ample evidentiary support for the ver-  ____________________ 8The following explanation exposes the fallacy in the unitary standard of proof urged by appellants.  [T]he evidence may well be sufficient to permit reasonable inferences that a given individual was more likely than not a member of the alleged conspiracy and performed a given act in furtherance of the conspiracy within the district of prosecution, thereby satisfying the venue requirement, even if the jury finds the same evidence not sufficiently persuasive to cause it, for purposes of as- sessing guilt, to draw those inferences be- yond a reasonable doubt.  United States v. Rosa, 17 F.3d 1531, 45 n.18 (2d Cir.) (citation ______________ ____ omitted), cert. denied, 115 S. Ct. 211 (1994). _____ ______ 16 dicts against each appellant.  3. Guilt  3. Guilt  _____ The Count II conspiracy charge required proof that the particular defendant and at least one other person expressly or tacitly agreed to commit a federal offense. DiMarzo, 80 F.3d at _______ 660. The government must have shown that the defendant volun- tarily participated to promote a criminal objective. Brandon, 17 _______ F.3d at 428. When, as in this case, mail fraud is an alleged goal of the conspiracy, the government must prove either the intent to use the mails or that such use was reasonably foresee- able. Yefsky, 994 F.2d at 890; see also United States v. Dray, ______ ___ ____ _____________ ____ 901 F.2d 1132, 1137 (1st Cir.) (noting that intent element in conspiracy differs from substantive mail fraud), cert. denied, _____ ______ 498 U.S. 895 (1990). A particular defendant need not have been familiar with all the details of the conspiracy or with the identities of all other conspirators. United States v. ______________ Innamorati, 996 F.2d 456, 470 (1st Cir. 1993), cert. denied, 510 __________ _____ ______ U.S. 1120 (1994); United States v. Bello-Perez, 977 F.2d 664, 668 _____________ ___________ (1st Cir. 1992).  A brief overview leaves no reasonable doubt that Billmyer, Cardiges, and other Honda sales executives, respec- tively, conspired to defraud Honda by accepting valuable consid- eration for awarding dealership franchises and other preferential treatment to Honda dealers and prospective dealers.  a. Billmyer a. Billmyer ________ As early as 1979, while Billmyer was the eastern 17 regional sales manager, Cardiges, as zone manager for the mid- Atlantic states, accepted a $10,000 payment from a Honda dealer in Philadelphia, and split it with Billmyer. In late 1979 or early 1980, Cardiges presented Billmyer with a gold Rolex watch worth as much as $15,000 from a large Honda dealer in the Wash- ington, D.C. area. Beginning with the 1984 holiday season and continuing through 1992, Cardiges received $20,000 to $25,000 each year from John Rosatti, a Honda dealer in New York City. Rosatti told Cardiges that he was paying Billmyer also, because, as Cardiges testified at trial, like other dealers Rosatti wanted "favorable treatment, wanted more automobiles, more franchises, and wanted the ability to have the ear of the people who were in power at Honda."  Cardiges and Billmyer both helped a dealer named Rick Hendrick acquire approximately thirty Honda and Acura franchises in various states, including Texas, Georgia, and the Carolinas. In return, Hendrick helped Cardiges buy a California residence from which Cardiges later realized a $250,000 gain. Thereafter, Hendrick defrayed approximately $150,000 in interest payments on a loan Cardiges had obtained to buy a $700,000 home in Laguna Hills, California. During this same 1989-92 time frame, Hendrick intimated to Cardiges that he was involved in financing Billmyer's home in Palm Springs as well. Cardiges also learned from Billmyer that Hendrick had provided Billmyer with a top-of- the-line BMW.  Cardiges described periodic payoffs from one Marty 18 Luftgarten, who owned dealerships in New Jersey, Philadelphia, and southern California. For example, at the grand opening of a Luftgarten dealership during the mid-1980s, Billmyer, Cardiges, and two other Honda sales managers, Bill Kutchera and Jeff Conway, gathered in a conference room where Luftgarten handed each an envelope containing $5,000 in cash. Around the holiday season, another dealer customarily sent Cardiges $5,000 gift certificates from Neiman-Marcus for both Cardiges and Billmyer. See Boylan, 898 F.2d at 242 (noting that defendants often cooper- ___ ______ ated with one another by collecting payments). The record is replete with other evidence of cash payments from dealers and lavish shopping trips to Hong Kong.  b. Josleyn b. Josleyn _______ Similarly, there was ample evidence to enable a ratio- nal jury to find beyond a reasonable doubt that Josleyn conspired with Cardiges and others to defraud Honda in connection with the Honda dealership franchises. In early 1991, while zone manager for the west coast, Josleyn arranged for a "friend" back east, Joe Pope, to pay $150,000 for the "open point" in Elk Grove, California. Josleyn approached Cardiges, national sales manager, and Robert Rivers, regional manager for the western United States, and advised that there would be money in it for all of them if Pope were to receive the Elk Grove dealership. Thereaf- ter, Cardiges, Rivers, and Josleyn, in direct violation of Honda procedure, decided not to prospect for suitable dealership candidates, and awarded the Elk Grove franchise outright to Pope. 19 As promised, Pope issued a $150,000 check payable to Gary & Associates, a company controlled by Josleyn and his brother Gary. Josleyn in turn gave Cardiges and Rivers each $50,000 in cash.  Cardiges testified that Ed Temple, a former Honda zone manager, approached him in the summer of 1991 in behalf of Bob Frink, a dealer interested in the Folsom, California point. Temple had accepted payoffs from dealers while employed by Honda, and after leaving the company in 1989 established a firm  Blakely Consultants to facilitate payments to Honda executives from dealers seeking new Honda franchises. Simply put, Temple told Cardiges that Frink was willing to pay Cardiges and Josleyn for the Folsom dealership. On August 5, 1991, Cardiges signed the Folsom LOI, and on the same day Frink paid Blakely Consul- tants $500,000 for services rendered. Three days later, Temple wrote a $166,666 check to Magnum Marketing, a company owned by Josleyn. Cardiges reported $166,666 from Blakely Consultants on his own 1991 income tax return, although Temple had agreed to hold Cardiges' one-third share until Cardiges left Honda.  We need belabor the point no further, as there was ample evidence to enable the jury reasonably to conclude, beyond a reasonable doubt, that Josleyn was a member of the Count II dealership franchise conspiracy. See Boylan, 898 F.2d at 242. ___ ______ 4. Venue 4. Venue _____ As a general rule, venue in a conspiracy case depends upon whether an overt act in furtherance of the alleged conspira- cy occurred in the trial district. United States v. Uribe, 890 _____________ _____ 20 F.2d 554, 558 (1st Cir. 1989); see 18 U.S.C. 3237(a) (1994). ___ The defendant need not have been physically present in the trial district during the conspiracy. United States v. Santiago, 83 _____________ ________ F.3d 20, 24-25 (1st Cir. 1996); see, e.g., Cordero, 668 F.2d at ___ ____ _______ 43-44 (furthering drug importation conspiracy with phone calls to undercover DEA agent in Puerto Rico); cf. United States v. ___ ______________ Georgacarakos, 988 F.2d 1289, 1294 (1st Cir. 1993) (contrasting _____________ venue for "group" and "individual" crimes). The government acknowledges that venue was proper in the District of New Hamp- shire only if there was enough evidence for a rational jury to find it more likely than not that Pedersen, Josleyn and Billmyer belonged to the Count II conspiracy.  Upon joining Honda as a district sales manager in July 1979, see supra notes 2 & 3, Pedersen learned that Honda policy ___ _____ prohibited sales executives from awarding LOIs for personal gain and from accepting gifts valued at more than $25 from dealers. In keeping with Honda policy, Pedersen objected in December 1979 when Bill Lia, a dealer in upstate New York, stuffed an envelope containing cash into Pedersen's pocket. Although Pedersen threatened to report the incident, he relented when Lia told him not to worry because Lia had "already handled the zone." More- over, Pedersen knew at the time that both his immediate supervi- sor, Northeast Zone Manager Bill Kutchera, and Billmyer, regional manager for the eastern United States, as well as Cardiges, worked at Honda headquarters in New Jersey. In fact, when Pedersen told Kutchera about the cash bribe tendered by Lia, 21 Kutchera advised Pedersen to ask for a gift certificate in place of the cash. Accordingly, Pedersen ultimately accepted a $300 gift certificate from Lia with Kutchera's explicit approval. Around this same time, Kutchera also told Pedersen that during the course of the previous year he had received two Rolex watch- es, a cruise, furniture, and other gifts, valued at $13,000, from various dealers. Pedersen testified that he frequently discussed dealer payoffs with Roger Novelly and Larry Finley, his Honda supervi- sors in Ohio. Novelly, the assistant zone manager, specifically told Pedersen that Billmyer and Cardiges were being "taken care of" by dealers, and Finley, the zone manager, admitted that Tom Bohlander had paid him for the Honda "open point" dealership franchise in West Cleveland.9 See, e.g., Boylan, 898 F.2d at 243 ___ ____ ______ (noting that tacit accord among alleged conspirators is permissi- bly inferred from evidence that defendants "often spoke to their victims about other victims or other defendants in words which plainly revealed that the crimes were interdependent"). Based on this evidence, and there was more, the jury would have been permitted to draw the reasonable inference that Pedersen and his various supervisors over the years had developed a shared under- ______ standing of an "unwritten policy" at Honda: dealers had to pay Billmyer and Cardiges, as well as other sales executives in the  ____________________ 9Significantly, Cardiges identified Finley, Novelly, and Kutchera as fellow conspirators. In addition, Pedersen testified that he subsequently received $5,000 from John Rosatti, a New York Honda dealer who admittedly paid both Cardiges and Billmyer. See supra Section II.B.3(a). ___ _____ 22 chain of command, in order to receive a Honda or Acura franchise or other favorable treatment. Id. __ John Orsini, a Honda and Acura dealer in Connecticut, provided corroborative testimony at trial, characterizing the kickbacks he had made to Billmyer, Pedersen, and Damien Budnick, Pedersen's subordinate, as a "way of doing business" with Honda. At Budnick's suggestion, Orsini met with Billmyer in September 1987 to discuss obtaining another Acura dealership. A few weeks later, Billmyer offered Orsini a franchise in Nanuet, New York, if Orsini created a "no-show" job for Billmyer's friend, Douglas T. Richert, at $1,000 per week. After Orsini accepted the Billmyer proposal, he received the Nanuet LOI.  Around the same time, Orsini discussed with Budnick and Pedersen the possibility that Orsini might obtain a new dealer- ship franchise in Salem, New Hampshire. According to Pedersen, Orsini and other dealers routinely and unilaterally mentioned Billmyer's name in conversation, as a means of "impress[ing]" on Pedersen the dealers' established connections with higher-level Honda sales managers. Orsini told Pedersen that he would be willing to pay for the Salem franchise, but not the $50,000 demanded by Budnick. After agreeing to help secure the Salem dealership for Orsini in February 1988, Pedersen received between $2,000 and $4,000 in cash from Orsini. Thus, given the circum- stantial evidence that both Billmyer and Pedersen shared a common goal or plan to defraud Honda by accepting illicit consideration for awarding new dealership franchises, the jury reasonably could 23 infer, by a preponderance of the evidence, that Billmyer and Pedersen defrauded Honda in connection with the Salem, New Hampshire LOI by accepting payoffs from a common source, Orsini. See, e.g., Brandon, 17 F.3d at 450 (finding single conspiracy, ___ ____ _______ despite variations in details and tactics, where main objective, structure, intended victim, and modus operandi remained con- stant); supra Section I.  _____ In addition to accepting illicit payments from Lia and Orsini, the record demonstrates, by a preponderance of the evidence, that Pedersen committed an overt act in New Hampshire in furtherance of the Count II conspiracy, by accepting a free Acura Integra from Bohlander's West Cleveland, Ohio, dealership in 1986. After Bohlander and Pedersen became friends, Pedersen agreed to help Bohlander acquire more Acura dealerships in exchange for a silent ownership interest in a Nashua, New Hamp- shire, dealership. Pedersen recommended Bohlander for the new Nashua franchise, and in due course Bohlander received it. Although Pedersen later declined an ownership interest in the Nashua dealership, he nonetheless let Bohlander pay roughly $18,000 in college tuition fees for Pedersen's son. Thus, the evidence sufficed to demonstrate, by a preponderance, that venue was proper in the District of New Hampshire. See Uribe, 890 F.2d ___ _____ at 558. Finally, there was evidence from which a rational jury reasonably could have inferred, by a preponderance of the evi- dence, that Bohlander routinely paid Billmyer and Cardiges as 24 well. Pedersen described a card game at Bohlander's Florida condominium in February 1991, during which Bohlander and Lou Tecco, a dealer associated with Marty Luftgarten, talked about paying bribes as a "way of doing business" with Honda, and noted that Billmyer and Cardiges had to be paid in order to get dealer- ships and other favorable treatment. Along with the evidence that Bohlander had paid Finley for the West Cleveland dealership and that dealers commonly bribed sales executives at each succes- sive level, see supra p. 22, Pedersen's testimony permitted the ___ _____ jury reasonably to conclude that it was more likely than not that Bohlander had paid Billmyer, the Acura Division head, as well as Pedersen, in return for the Nashua dealership in 1987. Thus, the similarity in the pattern of fraudulent transactions relating to new dealership franchises, the common core of "insider" partici- pants, and the temporal overlap would enable a rational jury reasonably to infer, under the applicable preponderance standard, that Pedersen, Billmyer, Josleyn, and Cardiges agreed, at least tacitly, to defraud Honda by accepting illicit consideration from candidates for new Honda dealership franchises in direct viola- tion of established Honda policy and procedures. See Morrow, 39 ___ ______ F.3d at 1233-34; Bello-Perez, 977 F.2d at 668 (noting that ___________ conspirators need not know all coconspirators); see also United ___ ____ ______ States v. Richerson, 833 F.2d 1147, 1152-54 (5th Cir. 1987). ______ _________ C. Other Claims By Josleyn C. Other Claims By Josleyn _______________________ 1. Sufficiency of the Evidence 1. Sufficiency of the Evidence ___________________________ (Counts I, III & IV)  (Counts I, III & IV)  __________________ After the government rested its case, Josleyn moved for 25 acquittal under Counts I, III, and IV, claiming that the evidence was insufficient to establish, beyond a reasonable doubt, that the Honda dealers and their dealer advertising associations had been victimized by the alleged mail fraud since the dealers and advertising associations had received the sales training and advertising services for which they paid. This claim fails as well.  In United States v. Allard, 926 F.2d 1237 (1st Cir. ______________ ______ 1991), we explained that it is no "defense that the victim received something in exchange even if it was equivalent in value _________ to what the victim was deceived into relinquishing." Id. at 1242 ___ (citing United States v. King, 860 F.2d 54, 55 (2d Cir. 1988), _____________ ____ cert. denied, 490 U.S. 1065 (1989)). Given that the proper _____ ______ inquiry under Allard is whether Josleyn intended to defraud the ______ dealers and advertising associations into parting with their money, there was ample evidence, particularly the testimony of Cardiges, to support the jury verdicts against Josleyn under Counts I, III, and IV. 2. Jury Instructions on 2. Jury Instructions on _______________________ Condonation Condonation ___________ The district court rejected Josleyn's proposed jury instruction that the government must prove, beyond a reasonable doubt, that Honda had not condoned Josleyn's fraudulent activi- ties. Ordinarily, a defendant is entitled to an instruction on his theory of the case as long as it is legally valid and there is sufficient evidence, viewed in the light most favorable to the defendant, to permit a reasonable juror to credit the defendant's 26 theory. United States v. Flores, 968 F.2d 1366, 1368-69 (1st ______________ ______ Cir. 1992); United States v. Shenker, 933 F.2d 61, 65 (1st Cir. _____________ _______ 1991). The government does not dispute that the evidence adduced at trial would have permitted the jury to find that native Japanese executives at the highest levels of Honda implicitly condoned the acceptance of bribes and kickbacks. Nevertheless, the trial court need not adopt the precise instructional language proposed by the defendant. United States v. DeStefano, 59 F.3d _____________ _________ 1, 3 (1st Cir. 1995).  Viewed as a whole, we think the instruction given by the district court fairly summarized Josleyn's defense theory:  Since the essential element of the crime charged is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of mail fraud. A defendant, however has no burden to estab- lish a defense of good faith. The burden is on the government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt.  . . . . It is the defendant Josleyn's theory of the case that American Honda knew of and con- doned; that is, gave tacit approval to the activities of its employees alleged in the indictment that were in violation of its policies. American Honda's knowledge or con- donation of the commission of an offense does not by itself constitute a defense or an __ ______ excuse. However, any evidence of American ___ ________ __ ________ Honda's actions or omissions, or evidence of _______ _______ __ _________ __ ________ __ deficiencies in the manner in which it imple- ____________ __ ___ ______ __ _____ __ ______ mented and enforced its policies and proce- ______ ___ ________ ___ ________ ___ ______ dures, may be considered by you to the extent _____ ___ __ __________ __ ___ __ ___ ______ that such evidence bears on the issue of ____ ____ ________ _____ __ ___ _____ __ whether or not Mr. Josleyn formed the re- _______ __ ___ ___ _______ ______ ___ ___ quired intent to commit the crimes with which ______ ______ __ ______ ___ ______ ____ _____ he is charged. Mr. Josleyn contends that __ __ _______ because he believed American Honda knew of and condoned the activities in question, he 27 did not possess the required intent to commit the offenses with which he is charged.  The defendant has no obligation what- soever to prove to you that his theory is correct, but rather the burden is always on the government to prove all of the material elements of each offense charged beyond a reasonable doubt[,] including the element of intent with respect to each offense[,] as I have already explained to you. (Emphasis added.)   The charge given by the trial judge unmistakably permitted the jury to consider all the condonation evidence in determining whether Josleyn had formed the requisite intent to defraud Honda. No more was required. See generally New England ___ _________ ___________ Enters., Inc. v. United States, 400 F.2d 58, 71-72 (1st Cir. ______________ _____________ 1968) (discussing "good faith" defense to mail fraud), cert. _____ denied, 393 U.S. 1036 (1969). Since Josleyn neither cites ______ authority, nor demonstrates, that any condonation by Honda was relevant to an element of the charged offenses other than intent, see Yefsky, 994 F.2d at 890-91 (listing elements of mail fraud ___ ______ conspiracy and substantive mail fraud); see also Aetna Cas. Sur. ___ ____ _______________ Co. v. P & B Autobody, 43 F.3d 1546, 1558-60 (1st Cir. 1994) ___ _______________ (RICO), we conclude that the jury instruction given by the district court was adequate. See DeStefano, 59 F.3d at 3; ___ _________ Shenker, 933 F.2d at 65-66 (rejecting proposed instruction _______ predicated on impermissibly broad defense); cf. United States v. ___ _____________ Wallach, 935 F.2d 445, 464 (2d Cir. 1991) (mail fraud statute _______ protects property interests of shareholders and corporation against officers' schemes).  3. Impeachment of Cardiges 3. Impeachment of Cardiges _______________________ 28 Josleyn contends that though the prosecutor was respon- sible for deliberately suborning false testimony from Cardiges, the district court unduly impeded Josleyn's efforts to impeach Cardiges on cross-examination. These claims are meritless. See ___ generally United States v. Osorio, 929 F.2d 753, 759-60 (1st Cir. _________ _____________ ______ 1991) (approving reasonable restrictions by trial court on repetitive, harassing, unduly prejudicial, irrelevant, or other- wise improper cross-examination); cf. United States v. Tavares, ___ _____________ _______ 93 F.3d 10, 14-15 (1st Cir. 1996) (rejecting baseless perjury allegation).  On cross-examination, defense counsel asked Cardiges to explain two newspaper articles in which his lawyer reportedly stated that the government had evidence that the top Japanese managers at Honda knew about the alleged criminal activities in its sales division. Cardiges testified that he neither autho- rized the press statements, nor knew their basis. On redirect, the prosecutor elicited testimony that though Cardiges and his attorney had been afforded "open access" to the government's file, Cardiges had seen "no documents that either indicated or show[ed] that the Japanese knew anything about kickbacks or gifts or anything like that." In response, Josleyn's counsel sought to confront Cardiges with several FBI interview reports obtained from the government's file which contained statements by Honda employees to the effect that the Japanese knew about the bribes and kickbacks.  The district court permitted defense counsel to use the 29 FBI reports for impeachment purposes, i.e., to show that Cardiges ____ either did not tell the truth, or had not reviewed the entire ______ contents of the government file. But the court ruled that the FBI interview reports were inadmissible hearsay if offered for their truth. See Innamorati, 996 F.2d at 480-81; Fed. R. Evid. ___ __________ 801(c) (defining hearsay). On appeal, Josleyn argues that the district court impermissibly restricted recross-examination by refusing to allow the jury to consider all hearsay statements in ___ the FBI interview reports.  Our review of the trial transcripts satisfies us that the district court accorded Josleyn ample leeway to explore the FBI interview reports in sufficient detail to enable the jury fairly to weigh Cardiges' testimony relating to the government's file. For example, Cardiges admitted on recross that he had never seen the FBI interview reports, and was "quite sure" that he was not able to get through the "thousands and thousands of documents" during the four-hour period he spent reviewing the government file. The district court did sustain several hearsay objections when defense counsel attempted to delve more deeply into the contents of the FBI interview reports. It did so properly, however, since Josleyn proffered no relevant non- hearsay purpose for probing further. Cf. United States v. ___ ______________ Hudson, 970 F.2d 948, 956-57 (1st Cir. 1992) (defense counsel ______ responded to hearsay objection with impeachment proffer). Nor does Josleyn now challenge these hearsay rulings. Accordingly, we find no error. See Fed. R. Evid. 103(a)(2).  ___ 30 4. Delayed Disclosure of Condonation Evidence  4. Delayed Disclosure of Condonation Evidence  __________________________________________ Josleyn claims that he was deprived of a meaningful opportunity to cross-examine Cardiges and other prosecution witnesses due to the government's delayed disclosure of certain letters written to the government by Cecil Proulx, a former Honda executive, outlining his efforts in the late 1980s to bring the pervasive bribes and kickbacks to the attention of Honda's top Japanese executives. The government produced some of the Proulx materials before trial, including a summary of his FBI interview, but found and unseasonably produced additional material months later upon learning that Josleyn intended to call Proulx as a witness tending to show that Honda's Japanese managers had condoned the illegal activities in its sales division. Josleyn unsuccessfully moved to dismiss the indictment on due process grounds.  Given the specific discovery request for condonation evidence, the government plainly had an obligation to furnish Josleyn with the Proulx materials in a more timely fashion. See ___ United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993), _____________ _________ cert. denied, 114 S. Ct. 2714 (1994); see also Fed. R. Crim. P. _____ ______ ___ ____ 16(a)(1)(C) (discovery relating to documents material to de- fense); 16(c) (continuing duty to disclose). Since the govern- ment failed seasonably to disclose evidence "material to guilt or punishment," United States v. Devin, 918 F.2d 280, 289 (1st Cir. _____________ _____ 1990) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)), which _____ ________ includes both exculpatory and impeachment evidence, we inquire 31 whether as a consequence of the delayed disclosure defense counsel was unable to use the material "effectively in preparing and presenting the defendant's case." Id. (quoting United States __ _____________ v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)). Due to its ________ greater familiarity with the dynamics of the case, we will not reverse a district court's ruling on delayed disclosure unless it amounts to a demonstrable abuse of discretion. Id. We discern ___ no abuse of discretion. First, a principal concern in delayed disclosure cases whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy, see id. ___ ___ at 290 is not significantly implicated in this case. Josleyn consistently pursued the same defense theory both before and after the Proulx materials were provided, by arguing that the Japanese managers at Honda had condoned the charged conduct. Secondly, even though the Proulx materials unquestionably provid- ed additional support for the condonation "defense," we are not persuaded that the delay in disclosure adversely affected the defense in any important respect. In fact, while Cardiges was on the witness stand, Josleyn's counsel observed that "the government's file is like 100,000 pages or so." See also infra ___ ____ _____ note 10. The defense took full advantage of the condonation evidence by using it in its own case, even before the tardily produced Proulx materials were made available, then featured the 32 government's delayed disclosure in its closing argument.10  On this record, we think the district court soundly concluded that the Proulx materials added little to the evidence previously produced by the government, and therefore its late disclosure had not impeded Josleyn's defense to a significant degree. See United States v. Catano, 65 F.3d 219, 227 (1st Cir. ___ _____________ ______ 1995) (noting cumulativeness of impeachment materials); Sepulveda, 15 F.3d at 1179 (holding that failure to produce _________ "incremental information" caused no prejudice). We note as well that Josleyn makes no claim that the prosecutor intentionally de- layed disclosure.  Furthermore, and by no means least importantly, the only relief Josleyn requested was the outright dismissal of the indictment. The district court has broad discretion to redress discovery violations in light of their seriousness and any prejudice occasioned the defendant. Osorio, 929 F.2d at 762-63; ______ see also Fed. R. Crim. P. 16(d)(2) (authorizing district court to ___ ____ "permit the discovery or inspection, grant a continuance, or prohibit the party from introducing the evidence not disclosed,  ____________________ 10Defense counsel argued in closing:  When you ask [a witness] a question, when the question is asked [whether] you've gone through our files and there's nothing there to indicate that Ameri- can Honda executives knew about these activities, or a question of that type, and there's tons of things, reams of things in that file, that's wrong. When the file isn't even complete because you have a memorandum from Mr. Proulx that you haven't turned over to the defense at all and don't get turned over till weeks later, well, isn't that question kind of a little bit false? 33 or . . . enter such other order as it deems just under the circumstances"). On the other hand, the draconian relief demand- ed by Josleyn was grossly disproportionate both to the prosecution's nonfeasance and any prejudice to the defense. See ___ Bello-Perez, 977 F.2d at 670 (favoring continuance over dismiss- ___________ al); accord Devin, 918 F.2d at 290-91. As Josleyn eschewed ______ _____ various alternative remedies more consonant with the government's culpability and any prejudice to the defense, see, e.g., Osorio, ___ ____ ______ 929 F.2d at 762-63 (noting, as alternative remedies, recalling witness for additional cross-examination, affording defense greater leeway with witnesses, and instructing jury that govern- ment failed to meet discovery obligations), we find no abuse of discretion in refusing to dismiss the indictment.  5. Closing Argument  5. Closing Argument  ________________ Josleyn claims that the lead prosecutor improperly vouched for the credibility of government witnesses, and Cardiges in particular, during rebuttal. Absent contemporaneous objec- tion, we may notice only "plain error." United States v. Tuesta- _____________ _______ Toro, 29 F.3d 771, 776-77 (1st Cir. 1994), cert. denied, 115 S. ____ _____ ______ Ct. 947 (1995); Fed. R. Crim. P. 52(b). Viewed in the context of the entire trial, United States v. Smith, 982 F.2d 681, 682 (1st _____________ _____ Cir. 1993), the prosecutor's remarks, though plainly inappropri- ate, did not undermine the fundamental fairness of Josleyn's trial. See United States v. Young, 470 U.S. 1, 16 (1985).  ___ _____________ _____ Although at times it may be difficult to distinguish improper vouching from zealous advocacy, there can be no doubt 34 that the statements at issue here constituted improper rebuttal:  Now there was a lot of suggestion of false play in this case. I want to say this. I'm a married person with a family, and I go home at night with a sound conscience. I have worked very hard on this case. Mr. Feith has worked very hard on this case. Mr. Mulvaney and Miss Roux have worked very hard on this case. And we are very proud of what we have done. We have done nothing to be ashamed of.11  Injecting the prosecutor's personal life and individual efforts into the decisional mix not only invited the jury to consider irrelevant matters beyond the record, but unfairly evoked jury sympathy and diverted attention from the relevant evidence. See ___ United States v. Rosales, 19 F.3d 763, 767 (1st Cir. 1994) ______________ _______ (prosecutor denied fabricating evidence against defendant).  There should be no need to remind federal prosecutors that they are not free to disregard the bounds of proper argument even in response to perceived provocation. See Young, 470 U.S. ___ _____ at 18-19. The important precept that the prosecutor may not vouch for the credibility of a government witness is deeply rooted in American law. See Rosales, 19 F.3d at 767 ("When the ___ _______  ____________________ 11Nor have we any doubt that defense counsel provoked the prosecution to these excesses. See United States v. Grabiec, __ ___ _____________ _______ F.3d __, __ (1st Cir. 1996) [No. 96-1131, slip op. at 4 (1st Cir. Sept. 25, 1996)]. Referring to Cardiges' testimony, Josleyn's counsel argued: "It's wrong to lie, and it's also wrong to help you lie; to ask them questions [when you know] that the answers are going to be untrue. . . . I call it disgusting." Later, he added: "You want to see mail fraud? Stick this indictment in the mail and you'll see a mail fraud." Josleyn's counsel made an improper appeal for jury nullification as well: "People aren't born and the Almighty says you may be a prosecutor. That's a right that's given by the people. It's a trust. And when it's abused, somebody's got to do something about it."  35 prosecutor places the credibility of counsel at issue, the advantage lies with the government . . . .") (citations omitted). Thus, a prosecutor may not lend the prestige of the government to buttress a witness, nor indicate to the jury that information known to the prosecutor, but not admitted in evidence, supports the government's theory of the case. Young, 470 U.S. at 18-19.  _____ The appropriate response for the prosecutor in these circumstances is to lodge a contemporaneous objection and request an appropriate curative instruction. See id. at 13. Failing ___ ___ that, the prosecutor is constrained to a fair discussion of the evidence. But for the brief passage challenged on appeal, see ___ supra p. 34, the prosecution adhered to the appropriate standard. _____ Under the "plain error" standard, appellants bear the burden of showing that the prosecutor's remarks resulted in prejudice, i.e., affected their substantial rights. See United ___ ______ States v. Olano, 507 U.S. 725, 732-34 (1993). Even then, howev- ______ _____ er, we will not notice error unless it caused "a miscarriage of justice" or seriously undermined "the integrity or public reputa- tion of judicial proceedings." Id. We must consider the likely ___ impact the prosecutor's remarks had on the jury in light of the entire record, including the closing argument presented by the defense. Young, 470 U.S. at 16-17.  _____ Compared with defense counsel's attack against the integrity of the prosecuting attorneys throughout closing argu- ment, see supra note 11, their rebuttal was moderate. See United ___ _____ ___ ______ States v. Oreto, 37 F.3d 739, 746 (1st Cir. 1994) (tolerating ______ _____ 36 measured response to repeated attempts to magnify government mis- conduct), cert. denied, 115 S. Ct. 1161 (1995). In all events, _____ ______ the district court prudently countered the risk of serious residual prejudice by promptly cautioning the jury that counsel's arguments are not evidence, and directing the jury to base its verdicts solely on the evidence. See United States v. Mejia- ___ ______________ ______ Lozano, 829 F.2d 268, 274 (1st Cir. 1987). Given the over- ______ whelming evidence against Josleyn, see supra Section II.B.3(b), ___ _____ the provocative excesses in the closing argument presented by his own counsel, and the timely jury instructions by the district court, the improper remarks by the prosecutor in rebuttal did not rise to the level of plain error. See Rosales, 19 F.3d at 767-68 ___ _______ (finding similar vouching harmless error).12 ________ D. The Billmyer Sentencing Claim D. The Billmyer Sentencing Claim _____________________________ Billmyer challenges a two-level enhancement of his base offense level ("BOL") for abusing a position of private trust. See U.S.S.G. 3B1.3 (1995). We review the 3B1.3 ruling de ___ __ novo. United States v. Tardiff, 969 F.2d 1283, 1289 (1st Cir. ____ _____________ _______  ____________________ 12Citing United States v. DiLoreto, 888 F.2d 996, 999 (3d ______________ ________ Cir. 1989), Josleyn suggests that prosecutorial vouching requires reversal per se. DiLoreto was not only inconsistent with First ___ __ ________ Circuit case law, it has been overruled. See United States v. ___ ______________ Zehrbach, 47 F.3d 1252, 1264-65 (3d Cir.) (en banc), cert. ________ _____ denied, 115 S. Ct. 1699 (1995). Furthermore, Josleyn's strongest ______ authority, see United States v. Smith, 962 F.2d 923, 933-36 (9th ___ _____________ _____ Cir. 1992) (finding plain error), is readily distinguishable. There, defense counsel did not allege that the prosecutor either withheld evidence or suborned perjury, id. at 934; moreover, the ___ prosecutor had invoked both the prestige of the government and ___ the authority of the court in rebuttal, id. at 936; cf. United ___ __ ______ States v. Perez, 67 F.3d 1371, 1379 (9th Cir. 1995) (distinguish- ______ _____ ing Smith on latter ground).  _____ 37 1992). As Billmyer acknowledges a sound factual basis for the  3B1.3 enhancement, we need only apply the pertinent guideline language.  If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may 2 ____ __________ ___ not be employed if an abuse of trust or skill ___ __ ________ __ __ _____ __ _____ __ _____ is included in the base offense level or __ ________ __ ___ ____ _______ _____ __ specific offense characteristic.  ________ _______ ______________ U.S.S.G. 3B1.3 (Nov. 1995) (emphasis added).  The district court applied U.S.S.G. 2B4.1 (commercial bribery) to determine Billmyer's BOL. As the specific offense characteristics listed in 2B4.1(b) are not germane,13 we must consider whether the BOL prescribed in 2B4.1 "included" an  ____________________ 13Section 2B4.1(b) provides: Specific Offense Characteristics (1) If the greater of the value of the bribe or the improper benefit conferred exceeded $2,000, in- crease the offense level by the corresponding number of levels from the table in 2F1.1 [of- fense-conduct guideline for fraud and de- ceit/forgery]. (2) If the offense -- (A) substantially jeopardizes the safety and soundness of a financial institution; or  (B) affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense, increase by 4 levels. If the resulting offense 4 level is less than 24, increase to level 24. 24 24 U.S.S.G. 2B4.1(b). 38 abuse-of-trust component which would render the offense level enhancement invalid under the second sentence in 3B1.3. The Guidelines prohibit the sentencing court from imposing an abuse-of-trust enhancement in a public bribery case, ______ see U.S.S.G. 2C1.1, comment. (n.3), unless special circumstanc- ___ es require reference to other offense guidelines, see id.  ___ ___ 2C1.1(c). Thus, in its main thrust the present challenge at- tempts to equate Billmyer's commercial bribery offense with bribery of a public official. According to Billmyer, the same general rule must apply because public bribery and private bribery are "virtually identical" offenses. We are not persuad- ed.  The absence of an explicit provision restricting the ________ application of the abuse-of-trust enhancement in commercial bribery cases severely undercuts the analogy urged by Billmyer. See United States v. Newman, 982 F.2d 665, 673-74 (1st Cir. 1992) ___ _____________ ______ (applying expressio unius est exclusio alterius principle in this _________ _____ ___ ________ ________ sentencing context), cert. denied, 510 U.S. 812 (1993). Further- _____ ______ more, the Sentencing Commission took pains throughout the Guide- lines to specify the circumstances in which courts should not impose enhancements for abuse of trust.14 In sum, the overall structure of the Guidelines simply does not warrant the categori-  ____________________ 14See, e.g., U.S.S.G. 2A3.1(b)(3), comment. (n.4) (sexual ___ ____ abuse); id. 2H1.1(b)(1), comment. (n.5) (violating civil ___ rights); id. 2P1.1(b)(1), comment. (n.3) (prison escape); id.  ___ ___ 2T1.4(b)(1), comment. (n.2) (aiding tax fraud); see also Newman, ___ ____ ______ 982 F.2d at 673-74; cf. United States v. Wong, 3 F.3d 667, 670 ___ ______________ ____ (3d Cir. 1993) (noting Commission's awareness of potential for "double counting").  39 cal ban advocated by Billmyer. Moreover, not only does Billmyer cite no supporting case law, but our research discloses ample authority for imposing an abuse-of-trust enhancement in such a case. For example, in United States v. Butt, 955 F.2d 77 (1st Cir. 1992), the court _____________ ____ provided clear explication of its rationale for upholding an abuse-of-trust enhancement in the case of a police officer convicted on a RICO charge, even though the underlying racketeer- ing activity included extortion under color of right.  The base offense level prescribed by the guidelines for a particular crime presumably reflects, or "includes," those characteris- tics considered by Congress to inhere in the crime at issue. In the case of extortion under color of right, abuse of trust would be one such characteristic, since Congress could reasonably have determined that every act of extortion under color of right involves an abuse of public trust. Because the RICO statute, by contrast, can be violated in innumerable ways, there are, arguably, no of- fense characteristics common to all RICO offenses. Id. at 89. The same holds true here.  ___ Billmyer was convicted of mail fraud conspiracy in violation of 18 U.S.C. 371. As not every mail fraud conspiracy involves an abuse of trust, we cannot conclude that the BOL for commercial bribery necessarily includes an abuse-of-trust element so as to preclude an enhancement pursuant to 3B1.3. See United ___ ______ States v. Kummer, 89 F.3d 1536, 1546-47 (11th Cir. 1996) (reject- ______ ______ ing similar argument under U.S.S.G. 2E5.1 (bribe affecting employee benefit plan)); cf. United States v. Connell, 960 F.2d ___ _____________ _______ 191, 199 (1st Cir. 1992) (finding that BOL applicable to currency 40 reporting violations did not encompass stockbroker's special skill).15 United States v. Sinclair, 74 F.3d 753, 762- _____________ ________ 63 (7th Cir. 1996), likewise demonstrates that the commercial bribery guideline does not take into account an abuse of trust.16 Sinclair, a bank officer, was convicted of accepting a bribe in violation of 18 U.S.C. 215(a)(2), a crime that would seem almost invariably to entail an abuse of trust. Yet the court noted that the statute did not define a single crime, see id.  ___ ___ 215(a)(1) (prohibiting person from offering bribe to bank offi- ________ cer), and reasoned that it would be wrong to require that the _______ briber, who did not necessarily breach a position of trust, receive the same sentence as the bank-officer recipient. Sinclair, 74 F.3d at 763. Similarly, we think Billmyer's greater ________ culpability, relative to other defendants who need not necessari- ly have abused a position of trust in the course of a mail fraud conspiracy, entitled the district court to impose the 3B1.3 adjustment in this case. Accordingly, we affirm the enhancement.  ____________________ 15One reasonable explanation for the two-level difference between the BOL for private bribery, see U.S.S.G. 2B4.1 (level ___ 8), and public bribery, see U.S.S.G. 2C1.1 (level 10), may lie ___ in the fact that the Sentencing Commission factored the abuse-of- trust element into the BOL for public bribery only.  16Sinclair is the only case involving an abuse-of-trust ________ enhancement under U.S.S.G. 2B4.1. We note, however, that other courts commonly allow an abuse-of-trust enhancement in embezzle- ment cases under U.S.S.G. 2B1.1. See, e.g., United States v. ___ ____ _____________ Broumas, 69 F.3d 1178, 1182 (D.C. Cir. 1995), cert. denied, 116 _______ _____ ______ S. Ct. 1447 (1996). 41 III III CONCLUSION CONCLUSION __________ Finding no reversible error, the district court judg- ments are affirmed.  AFFIRMED. AFFIRMED. ________ 42